714 A.2d 271
SHERWOOD BAXT AND SAIDA BAXT, PLAINTIFFS–APPELLANTS, v. GERALD A. LILOIA AND ANTHONY J. SYLVESTER, DEFENDANTS–RESPONDENTS.

Argued September 9, 1996—Decided July 17, 1998.
Reconsideration Denied Oct. 6, 1998.

*Helen Davis Chaitman,* argued the cause for plaintiffs-appellants (*Ross & Hardies,* attorneys; *Ms. Chaitman, George B. Gelman,* of counsel).

*Peter N. Perretti, Jr.,* argued the cause for defendants-respondents (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Perretti* and *Michael Cole,* of counsel; *Harold L. Kofman,* on the brief).

PORITZ, C.J.

In this appeal, plaintiffs have asked the Court to recognize a new cause of action premised upon a breach of the Rules of Professional Conduct ("RPCs" or "Rules") adopted by the Court for the governance of the legal profession. More specifically, plaintiffs urge us to permit this new claim to be brought against attorneys who represent an adversary of the claimant. A majority of the Appellate Division declined to sanction lawsuits "based solely on an allegation that the conduct of the[ ] defendants violated the Rules of Professional Conduct." 284 *N.J.Super.* 221, 223, 664 *A.2d* 948 (1995) (*Baxt* II). The dissenting member would permit civil liability upon a violation of the Rules resulting in foreseeable injury to a third party. *Id.* at 224, 664 *A.2d* 948 (Dreier, P.J.A.D., dissenting). The issue is before the Court as of right pursuant to *Rule* 2:2–1(a)(2). *See Manalapan Realty v. Township Committee,* 140 *N.J.* 366, 377, 658 *A.2d* 1230 (1995). We agree with the majority of the panel below and affirm with modifications not relevant to this issue.

# I

This case arose as a dispute over the propriety of litigation tactics used by defendants Gerald Liloia and Anthony Sylvester in an underlying foreclosure suit. Plaintiff Sherwood Baxt was a partner with Paul Hartman and Paul Baxt ("the debtors") in The Grove Mercantile Center ("Grove"). Both Sherwood Baxt and plaintiff Saida Baxt were defendants in the foreclosure suit brought by the Summit Trust Company ("Summit") alleging Grove's default on a construction loan from Summit to Grove.

Defendants Liloia and Sylvester are attorneys who represented Summit in the foreclosure litigation.

Grove obtained construction financing for a commercial real estate project in Jersey City from Summit in October 1988 by way of two mortgage loans, one for $3.8 million and the other for $300,000. The original documents provided for periodic advances to Grove and for repayment of the entire debt on November 1, 1989. The debtors were also accorded the right to a six-month extension upon payment of $20,500. Before November 1989, the debtors realized they needed an extension of the construction loan beyond six months and sought an additional year from the bank, which Summit granted.

The debtors did not repay the loan at the end of the one-year extension period and Summit instituted foreclosure proceedings in March 1991. At issue in the foreclosure litigation was whether the extension was granted subject to a mortgage modification agreement containing a release of any lender-liability counterclaim Grove may have had against Summit. Although the debtors later questioned whether the modification agreement had been executed, it was undisputed that Grove had paid two separate fees, each in the amount of $20,500 as required by the modification agreement, and that subsequently Summit advanced sums in excess of $1,400,000 to Grove.

In discovery Summit produced its credit file to Grove. The file contained a copy of the modification agreement signed only by a bank officer, Jennifer Calenda. However, when Summit's attorneys examined Grove's files, they found and copied an agreement signed by both Calenda and by Grove partner Paul Hartman. Summit later moved for summary judgment based in large part on the release provision of the modification agreement. The summary judgment motion and ensuing events constitute the gravamen of this action against Summit's attorneys, defendants Liloia and Sylvester. Defendants attached a copy of the modification agreement executed by Jennifer Calenda and Paul Hartman to the summary judgment motion. No reference was made to the source

of the document. In response to the motion, the debtors contested the validity and enforceability of the release; however, they neither denied Hartman's execution of the agreement nor the fact of delivery of his executed copy to the bank, although Hartman had previously informed his attorney that he did not remember executing or returning the agreement to Summit.

Grove subsequently made a cross-motion for a determination of no deficiency liability and to compel the depositions of bank officers that the debtors had been seeking for some months. Prior to her first scheduled deposition, Grove's attorney requested access to the bank's credit file. The defendants instructed Summit officers to place the copy of the modification agreement signed by both Hartman and Calenda in the bank's files. Subsequently, in her December 4, 1991 deposition, bank officer Calenda said that Hartman had faxed a signed copy of the modification agreement to the bank and that additional monies would not have been disbursed to Grove had Summit not received the signed agreement. During Calenda's December 4 deposition and later at a December 7, 1991 deposition of a former Summit officer, the debtors' attorney asked for both the originals and faxed copies of the mortgage and note modification agreement in the bank's files. None were provided. The debtors' attorney reviewed her client's files before resuming Calenda's deposition on December 27, 1991 and realized that the modification agreement submitted with Summit's motion for summary judgment had come from the Grove files. At the deposition, the attorney asked Calenda "where [the agreement] came from" and defendant Liloia stated for the first time that the source of the document was the debtor's files.

Plaintiffs brought this action on June 18, 1992. Their complaint seeks damages for tortious concealment of evidence (Count I) and for alleged breaches of the RPCs (Count II). Plaintiffs ask for costs associated with the depositions and the review of their own files through which they learned that the document signed by Hartman came from those files. On defendants' motion to dismiss the complaint, the Chancery Division dismissed the second count

in December 1992, concluding that plaintiffs' claim the RPCs had been violated was a collateral matter over which the court did not have "primary jurisdiction."

The parties settled the Grove foreclosure litigation by agreement on February 23, 1993, expressly reserving the plaintiffs' right to continue with the present lawsuit. Subsequently, the trial court found that plaintiffs could not maintain a cause of action based on spoliation of evidence because they had not demonstrated justifiable reliance on the copy of the modification agreement attached to Summit's motion. The court granted summary judgment to defendants.

The Appellate Division affirmed both the dismissal of the RPC claim and the grant of summary judgment on the spoliation claim. 281 *N.J.Super.* 50, 56–58, 656 *A*.2d 835 (1995) (*Baxt* I). A majority of the panel examined prior New Jersey precedent and found that no case had "involved a cause of action for damages by an adversary premised solely on an attorney's alleged disregard of his ethical responsibilities." *Id.* at 56, 656 *A*.2d 835. The majority's understanding of the RPCs lies at the heart of its holding:

> The underlying purpose of the Rules of Professional Conduct ... is not to serve as a source of litigation, but rather to express the fundamental standards required to uphold the integrity of our legal system. The interests the Rules of Professional Conduct seek to vindicate are the interests of society in assuring a legal system based on integrity and honesty, not private interests.
>
> [*Ibid.*]

The court declined to permit a new cause of action based on the Rules. Judge Dreier concurred in the judgment, although he would not have found plaintiffs precluded from recovery except for the global settlement of the foreclosure lawsuit. *Id.* at 58–59, 656 *A*.2d 835 (Dreier, P.J.A.D., concurring).

On remand from this Court for reconsideration in light of plaintiffs' assertion that the settlement of the Grove litigation expressly excluded their claims against the defendants, the Appellate Division reaffirmed its decision. *Baxt* II, *supra*, 284 *N.J.Super.* at 222–23, 664 *A*.2d 948. Judge Dreier dissented, finding that

the plaintiffs had asserted an actionable claim under the RPCs. *Id.* at 223, 664 *A.*2d 948 (Dreier, P.J.A.D., dissenting).

## II

This case raises the issue whether a violation of the Rules of Professional Conduct can be used to provide a basis for civil liability against an adversary's attorney. The Baxts' complaint asserts that defendants breached *RPC* 3.3 ("Candor Toward the Tribunal"), *RPC* 3.4 ("Fairness to Opposing Party and Counsel"), and *RPC* 4.1 ("Truthfulness in Statements to Others"). Plaintiffs have argued on appeal that defendants' conduct also violated *RPC* 1.2(d) ("Scope of Representation"). Plaintiffs press the Court to recognize a new cause of action for breach of the RPCs.

The New Jersey Rules of Professional Conduct are based on the American Bar Association (ABA) Model Rules [1] as revised by the Supreme Court Committee on the Model Rules of Professional Conduct and modified and adopted by this Court on July 12, 1984. *See R.* 1:14. Although our Rules do not contain the explanatory material which introduces the ABA Model Rules, *see* Pressler, *Current N.J. Court Rules,* Introduction to Rules of Professional Conduct (1998), reference to the Scope section of the ABA Rules is instructive. On the issue before us, the section explicitly states:

> Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

---

[1] The Model Rules replaced the Code of Professional Responsibility (CPR), which had been adopted by the ABA in 1970. The CPR consisted of Canons, Ethical Considerations, and Disciplinary Rules. This tripartite structure was considered confusing and difficult to administer. *See* Note, *The Evidentiary Use of the Ethics Codes in Legal Malpractice: Erasing a Double Standard,* 109 *Harv. L.Rev.* 1102, 1103 (1996).

> Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.
>
> [*Model Rules of Professional Conduct,* Scope (1992).]

By this language, the ABA "intended to make clear that the purpose of the Model Rules was to regulate lawyer conduct through the disciplinary process, not to serve as a basis for civil liability." *See The Legislative History of the Model Rules of Professional Conduct: Their Development in the ABA House of Delegates* 20 (1987).

Consonant with the intent of the ABA, no New Jersey case has allowed a cause of action based solely on a violation of the RPCs. *See Sommers v. McKinney,* 287 *N.J.Super.* 1, 13, 670 *A.2d* 99 (App.Div.1996) ("Violation of the rules of professional conduct do[es] not *per se* give rise to a cause of action in tort."); *Ruberton v. Gabage,* 280 *N.J.Super.* 125, 130, 654 *A.2d* 1002 (App.Div.) (same), *certif. denied,* 142 *N.J.* 451, 663 *A.2d* 1358 (1995); *Petrillo v. Bachenberg,* 263 *N.J.Super.* 472, 483, 623 *A.2d* 272 (App.Div. 1993) (same), *aff'd,* 139 *N.J.* 472, 655 *A.2d* 1354 (1995); *Albright v. Burns,* 206 *N.J.Super.* 625, 634, 503 *A.2d* 386 (App.Div.1986) (same). Moreover, our research has found no case in any other jurisdiction permitting the RPCs to be used in this manner.[2] Whether analyzing the issue under the Model Rules, the Model Code of Professional Responsibility, or other local ethics provisions, no court has found a cause of action premised solely on a breach of the relevant provisions to be viable. *See, e.g., Terry Cove North, Inc. v. Marr & Friedlander, P.C.,* 521 *So.2d* 22 (Ala.1988) (holding that violation of state's legal ethics rules alone does not create cause of action against attorney); *Orsini v. Larry Moyer Trucking, Inc.,* 310 *Ark.* 179, 833 *S.W.2d* 366 (1992) (same);

---

[2] Courts in other jurisdictions have relied on the Scope section of the ABA Model Code in holding that violations of the Rules of Professional Conduct do not give rise to an independent cause of action against an attorney. *See, e.g., Orsini v. Larry Moyer Trucking, Inc.,* 310 *Ark.* 179, 833 *S.W.2d* 366 (1992); *Smith v. Haynsworth, Marion, McKay & Geurard,* 322 *S.C.* 433, 472 *S.E.2d* 612 (1996); *Hizey v. Carpenter,* 119 *Wash.2d* 251, 830 *P.2d* 646 (1992).

*Allen v. Lefkoff, Duncan, Grimes & Dermer, P.C.*, 265 Ga. 374, 453 S.E.2d 719 (1995) (same); *L & H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372 (Minn.1989) (same); *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 750 P.2d 118 (1988) (same); *Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.*, 813 S.W.2d 400 (Tenn.1991) (same); *see also Mozzochi v. Beck*, 204 Conn. 490, 529 A.2d 171, 176 (1987) ("Every court that has examined this question has concluded that the Code of Professional Responsibility does not, *per se*, give rise to a third party cause of action for damages."); *Beattie v. Firnschild*, 152 Mich. App. 785, 394 N.W.2d 107 (1986) (stating that violations of Code of Professional Responsibility create rebuttable presumption of malpractice, but are not negligence *per se* ); *Hizey v. Carpenter*, 119 Wash.2d 251, 830 P.2d 646, 651 (1992) (*en banc* ) ("Because the CPR and RPC explicitly, and in what we deem to be clear and unambiguous language, disclaim any intent to create civil liability standards, we refuse to hold their violation creates a cause of action for malpractice.").

Courts in New Jersey and elsewhere have nonetheless recognized the relevance of the Rules in civil cases against attorneys. *See, e.g., Allen, supra*, 453 S.E.2d at 721 (finding that "pertinent Bar Rules are relevant to the standard of care in a malpractice action"); *Petrillo, supra*, 139 N.J. at 479, 655 A.2d 1354 (finding RPCs to be useful in determination "whether an attorney owes a duty to a non-client third party"); *Smith v. Haynsworth, Marion, McKay & Geurard*, 322 S.C. 433, 472 S.E.2d 612, 614 (1996) (holding that, "in appropriate cases, the RPC may be relevant and admissible in assessing the legal duty of an attorney in a malpractice action"); *Lazy Seven Coal Sales, Inc., supra*, 813 S.W.2d at 405 (reasoning that, "[e]ven though ... the Code does not define standards for civil liability, the standards stated in the Code are not irrelevant in determining the standard of care in certain actions for malpractice"). Our courts have recognized that the existence of a duty owed by an attorney may be supported by reference to an attorney's obligations under the RPCs, and that plaintiffs may present evidence that an attorney has violated the

RPCs in cases claiming the attorney has breached his or her duty of care.

Thus, in *Albright v. Burns, supra,* the Appellate Division found that an attorney had a duty to third party beneficiaries of a will where the attorney had assisted his client in removing substantial assets from decedent's estate prior to his death. 206 *N.J.Super.* at 632–33, 503 *A.2d* 386. The court drew support from the "newly-adopted" Rules of Professional Conduct, citing *RPC* 1:15 (requiring a lawyer to deal properly with property belonging to third person) and *RPC* 1.7 (generally limiting dual representation where clients' interests are adverse) because the attorney "represent[ed both] the estate and its principal debtor." *Id.* at 633–34, 503 *A.2d* 386. The court explained:

> While violations of ethical standards do not *per se* give rise to tortious claims, the standards set the minimum level of competency which must be displayed by all attorneys. Where an attorney fails to meet the minimum standard of competence governing the profession, such failure can be considered evidence of malpractice.
> [*Id.* at 634, 503 *A.2d* 386 (citations omitted).]

The Appellate Division has also allowed a former husband to maintain a cause of action for abuse of process against his ex-wife's attorney. In *Tedards v. Auty,* 232 *N.J.Super.* 541, 548, 557 *A.2d* 1030 (App.Div.1989), the defendant was alleged to have obtained a writ of *ne exeat* on his client's false certification and then to have threatened further use of the writ to force a favorable settlement and payment of counsel fees. The court characterized the defendant's acts by reference to *RPC* 3.3(a)(4), noting that "[t]he duty to represent a client does not shield an attorney from the consequences of offering evidence that he knows is false." *Id.* at 551, 557 *A.2d* 1030. In this case, the rule was used as a standard against which the defendant's conduct could be measured in considering whether plaintiff's allegations were sufficient to make out the elements of the tort of abuse of process.

In *Petrillo v. Bachenberg, supra,* this Court recently approved prior Appellate Division opinions wherein attorneys were found to "owe a limited duty in favor of specific non-clients." 139 *N.J.* at 479–80, 655 *A.2d* 1354 (discussing *R.J. Longo Constr. Co. v.*

*Schragger*, 218 *N.J.Super.* 206, 209–10, 527 *A.*2d 480 (App.Div. 1987); *Albright, supra*, 206 *N.J.Super.* at 632–33, 503 *A.*2d 386; *Stewart v. Sbarro*, 142 *N.J.Super.* 581, 593, 362 *A.*2d 581 (App. Div.), *certif. denied*, 72 *N.J.* 459, 371 *A.*2d 63 (1976)). *Petrillo* involved a buyer of real property who alleged negligent misrepresentation by the seller's attorney for failure to provide complete information about the results of percolation tests conducted on the property. In determining that the seller's attorney owed a duty to the buyer, we "recognize[d] that attorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorneys' representations and the non-clients are not too remote from the attorneys to be entitled to protection." *Id.* at 483–84, 655 *A.*2d 1354. We said that the existence of a "duty to a non-client third party [in these circumstances] depends on balancing the attorney's duty to represent clients vigorously, *Rules of Professional Conduct, Rule* 1.3 (1993), with the duty not to provide misleading information on which third parties foreseeably will rely, *Rules of Professional Conduct, Rule* 4.1 (1993)." *Id.* at 479, 655 *A.*2d 1354; *see also Malewich v. Zacharias*, 196 *N.J.Super.* 372, 376–77, 482 *A.*2d 951 (App.Div. 1984) (finding support in Disciplinary Rules for duty to opposing counsel where negligent or intentional misrepresentation of third-party defendant had directly caused counsel's malpractice).

■ In *Albright, supra*, plaintiffs alleged breach of fiduciary duty and negligence; in *Tedards, supra*, plaintiff claimed abuse of process against a former adversary's attorney; and in *Petrillo, supra*, the claim was for negligent misrepresentation. In each of these cases, the court was required to determine whether, in the factual context, a duty was owed by an attorney to third parties. In deciding whether a duty existed and, also, whether the attorney had breached the standard of care, the Court considered pertinent RPCs. Neither the Appellate Division nor this Court has held, however, that the RPCs in themselves create a duty or that a violation of the RPCs, standing alone, can form the basis for a cause of action. We decline to do so today.

The myriad of courts that have considered this issue have focused on the same concerns we express in this opinion. First, there is general reliance on the ABA Model Code, and frequently a particular state's code, for the principle that state disciplinary codes are not designed to establish standards for civil liability but, rather, to provide standards of professional conduct by which lawyers may be disciplined. *See supra* at 197–198, 714 *A.*2d at 274–275; *Lazy Seven Coal Sales, Inc., supra,* 813 *S.W.*2d at 404 (quoting *Terry Cove North, supra,* 521 *So.*2d at 23); *Garcia, supra,* 750 *P.*2d at 123. Indeed, the Supreme Court of Washington has refused to allow juries even to be informed about the RPCs, not only because they do not set the standard for civil liability, but also because, in that court's view, they "provide only vague guidelines" for governing the practice of law within the State. *Hizey, supra,* 830 *P.*2d at 652. Although we approve reference to the RPCs in assessing the existence of a duty to third parties and as a measure of the minimum standard of care, we are mindful of the Washington court's admonition in deciding that a new cause of action based on the RPCs is unwarranted.

The disciplinary rules serve purposes that are substantially different from those of an individual litigant in a civil action. The *Hizey* Court has looked closely at those differences:

> First, a lawyer may be disciplined even if the misconduct does not cause any damage. The rationale is the need for protection of the public and the integrity of the profession. Second, although the severity of the breach may affect the nature of the discipline, the prophylactic purpose of the ethical rules may result in a sanction even if the conduct would not otherwise constitute a civil wrong. Third, even if the injured party initiates a disciplinary complaint, that individual is not a party to the proceeding.
>
> [*Ibid.* (citation and internal quotation marks omitted).]

The New Jersey disciplinary system is also designed to protect the public and "the integrity of the profession."

■ Moreover, although various of the Rules set forth prohibitions, others are framed as precatory guidelines. *Compare RPC* 3.3(a)(1) ("A lawyer shall not knowingly ... make a false statement of fact or law to a tribunal ...."), *with RPC* 2.1 ("In

representing a client, a lawyer shall exercise independent profes-
sional judgment and render candid advice. In rendering advice, a
lawyer may refer not only to law but to other considerations, such
as moral, economic, social and political facts, that may be relevant
to the client's situation."), *and RPC* 3.2 ("A lawyer shall make
reasonable efforts to expedite litigation consistent with the inter-
ests of the client and shall treat with courtesy and consideration
all persons involved in the legal process."). Many of the disciplin-
ary rules are aspirational in nature and, therefore, particularly
unsuitable for use outside of the disciplinary system. Certainly, a
claim against a lawyer for failure to treat a third party with
courtesy and consideration, in those cases where such conduct
does not otherwise constitute an actionable tort, would be a most
difficult claim to put forward. The concept of professionalism
embodied in *RPC* 3.2 lies at the core of what it means to be a good
lawyer; yet, a lack of courtesy and consideration, though repre-
hensible, would be an inappropriate predicate upon which to base
a civil action. Even when consideration of a rule is useful in
determining whether a duty exists or a standard of care has been
breached, the "[r]ule must be intended to protect a person in the
plaintiff's position or be addressed to the particular harm suffered
by the plaintiff." *Allen, supra,* 453 *S.E.*2d at 721–22.

Plaintiffs have, however, expressed concern about whether New
Jersey's disciplinary system serves as an effective deterrent to
unethical behavior. Yet, our system has been recognized as "one
of the most demanding disciplinary systems in the nation." James
R. Zazzali, *Disciplining Attorneys: The New Jersey Experience,* 1
*Geo. J. Legal Ethics* 659, 661 (1988). Chief Justice Wilentz wrote,
almost twenty years ago, "that the principal reason for discipline
is to preserve the confidence of the public in the integrity and
trustworthiness of lawyers in general." *In re Wilson,* 81 *N.J.* 451,
456, 409 *A.*2d 1153 (1979). He believed that "public confidence in
this Court and in the bar as a whole requires the strictest
discipline." *Id.* at 461, 409 *A.*2d 1153. His message remains

powerful today.[3] We reject plaintiffs' contention that a cause of action based on a violation of the RPCs is necessary to ensure that attorneys conform their conduct to the high standards set forth in the Rules.

## III

In the courts below, plaintiffs also alleged tortious concealment of evidence by defendants; however, the parties dispute whether this claim is properly before this Court. Defendants contend that the claim has not been preserved because it was not expressly addressed by the dissent in the Appellate Division. *See R.* 2:2–1 (limiting the scope of as-of-right appeals to Supreme Court to "those issues as to which ... there is a dissent in the Appellate Division"). Plaintiffs assert that the claim is properly before us because the dissenting judge referenced his earlier concurring opinion, stating that it "should have been a dissent," *Baxt* II, *supra,* 284 *N.J.Super.* at 224, 664 *A.*2d 948 (Dreier, J., dissenting), and because the earlier concurrence noted "little difference between the liability for spoliation of evidence[4] and the alleged acts

---

[3] Seven years ago, the Court described the New Jersey attorney disciplinary system as a "system second to none." *In re Konopka,* 126 *N.J.* 225, 236, 596 *A.*2d 733 (1991) (citing Bumsted & Guttman, *New Jersey Leads Nation with Stringent Discipline,* Beyond the Law, Gannett News Service Special Report, pt. II at 12 (1986)). Today, that system has been streamlined and made more accessible to the general public through rule changes instituted in 1994. *See R.* 1:20–9(b), (c) (stating that "[a]ll proceedings shall be public except" in certain enumerated instances and that "all documents and records filed subsequent to the filing and service of a complaint ... shall be available for public inspection"); Cammarere, *Attorney Penalties Zoom,* 7 N.J. Lawyer 1, 1, 7 (May 4, 1998) (reporting on "tougher" and "more efficient" new disciplinary system); *Office of Attorney Ethics Report to the Supreme Court of New Jersey and Disciplinary Oversight Committee* (February 25, 1998) (providing overview of expeditious handling of ethics matters in 1997).

[4] As a technical matter, the tort of spoliation has not been alleged. The term "spoliation" is defined as "[t]he intentional destruction of evidence.... The destruction, or the significant and meaningful alteration of a document or instrument." *Black's Law Dictionary* 1401 (6th ed.1990) (citation omitted); *see*

of defendants," *Baxt I, supra,* 281 *N.J.Super.* at 59, 656 *A.*2d 835. In essence, plaintiffs argue that the dissenting judge incorporated by reference the views expressed in his earlier concurring opinion.

■ We do not read the dissent's passing reference in his earlier concurring opinion as an unambiguous pronouncement that defendants' acts constituted tortious concealment of evidence. Moreover, the dissent—which is the basis for plaintiffs' appeal— does not mention plaintiffs' tortious concealment claim but, rather, specifically focuses on "plaintiffs' civil claim for breach of the ethical rules." *Baxt II, supra,* 284 *N.J.Super.* at 224, 664 *A.*2d 948 (Dreier, J., dissenting). We conclude that a claim based on tortious concealment has not been preserved for review by this Court.[5]

Nonetheless, we consider it appropriate to make a few observations concerning the principles underlying a tortious concealment claim. This claim was first recognized in New Jersey as recently as 1991 in *Viviano v. CBS, Inc.,* 251 *N.J.Super.* 113, 123–26, 597 *A.*2d 543 (App.Div.1991), *certif. denied,* 127 *N.J.* 565, 606 *A.*2d 375 (1992). The plaintiff in *Viviano* was hurt when a machine she was operating malfunctioned causing substantial injuries to her hand. Despite repeated discovery requests, the defendant withheld an internal memorandum written three days after the accident that would have provided "key information plaintiff needed to recover for her injuries." *Id.* at 124, 597 *A.*2d 543. To prevail on a claim of tortious concealment, the Appellate Division required plaintiff to prove that: there was a legal obligation on defendant's part to

---

*Viviano v. CBS Inc.,* 251 *N.J.Super.* 113, 125–26, 597 A.2d 543 (App.Div.1991) (noting that destruction of evidence is element of tort of spoliation), *certif. denied,* 127 *N.J.* 565, 606 A.2d 375 (1992). In this case plaintiffs' claim of tortious concealment arises from the allegation that defendants concealed the source of the modification agreement attached to their motion for summary judgment, not that defendants destroyed or substantially altered the agreement.

[5] When there is any question whether a dissent in the Appellate Division has ruled on a specific claim, a petition for certification should be filed seeking review by the Supreme Court of any such claim. *R.* 2:12–9.

disclose; the information was material to plaintiff's case; plaintiff could not have "readily" obtained the information without disclosure by the defendant; there was intentional nondisclosure; and plaintiff "was harmed by relying on the nondisclosure." *Id.* at 123, 597 *A.*2d 543.

■ *Viviano* is a textbook case for tortious concealment. In *Viviano,* defendant was legally required to comply with plaintiff's discovery requests. Instead, defendant was found to have purposefully held back a memorandum that provided the very information that plaintiff needed to prove her case. This information was "material" because it went to the crux of plaintiff's complaint. And, except for a fortuitous accident in which plaintiff gained access to her personnel file, she could not have found the critical memorandum without disclosure by the defendant. In the case at bar, as the Baxts' attorney candidly admitted during oral argument before the Court, the answer to her question about the source of the signed modification agreement lay in her own client's files, files she could be presumed to have reviewed by the time of the bank's summary judgment motion. When she did review those files, she learned that they were the source of the signed agreement. Moreover, discovery of the provenance of the signed modification agreement still left open the question whether it was an enforceable document. Most important, the agreement was a relatively insignificant factor in a case involving a default on loans totaling $5,500,000. When the plaintiffs ultimately settled the foreclosure litigation, they surely weighed the value of their lender-liability counterclaim against Summit in determining that settlement was in their best interest.

These facts do not make out a claim for tortious concealment of evidence.

## IV

### A

The record before this Court presents an object lesson in unprofessional behavior by experienced and knowledgeable trial

lawyers. For a period spanning the course of at least one month, between November and December 1991, defendants Liloia and Sylvester knowingly and deliberately obstructed the discovery process in the Summit foreclosure action by misleading plaintiffs about the source of the signed modification agreement and by refusing to respond candidly to specific requests for direct and accurate information. The sequence of events during which this behavior took place can be briefly described.

In June 1991, the bank produced its credit file for Grove's inspection. At that time the file contained one copy of the modification agreement signed only by bank officer Jennifer Calenda. From July 31 to August 1, 1991, Grove in turn produced documents for the bank's inspection, wherein defendants found and copied an original modification agreement signed by Paul Hartman and witnessed, notarized and signed by Calenda. Subsequently, on September 27, 1991, Summit filed a motion for summary judgment, attaching in support a copy of the executed modification agreement obtained through discovery. Grove opposed Summit's motion and filed a cross-motion to compel depositions, which was granted.

Grove's attorney, by letter dated November 27, 1991, requested that defendants make the "bank's original credit file" available for her use during her scheduled depositions. Presumably this request was not honored at the November 30, 1991 deposition of Scott Witherspoon, a former bank officer, as Grove's attorney renewed her request by letter dated December 1, 1991. Prior to the next scheduled deposition, defendant Liloia instructed Calenda to insert the copy of the agreement signed by Hartman and found in Grove's files into the bank's credit file.

At the December 4, 1991 deposition of Calenda, Grove's attorney attempted to find out whether the bank had ever received an original copy of the modification agreement signed by Paul Hartman. Defendants Liloia and Sylvester promised to investigate whether the bank had received an original or a facsimile only. During the deposition, Grove's attorney also repeated her request

for access to the bank's original files. Although it does not appear that she received the files at the deposition, defendant Sylvester did indicate by letter dated December 5, 1991 that "the original files were produced again" for her inspection on December 4.

On December 7, 1991, prior to a second deposition of Witherspoon, Grove's attorney reviewed what Sylvester characterized as "the original bank files" and listed for the record the documents she found, including the copy of the signed modification agreement. In the deposition which followed, the attorney repeatedly requested that defendant Sylvester produce "the document on which [the bank] moved for summary judgment." Even more specifically, she asked Sylvester if "[t]he copy annexed to the motion for summary judgment[ ] was ... taken from the bank's files?" The following colloquy took place:

> Mr. Sylvester: I'm not here to answer questions. I don't know. You know, I'm not going to answer the questions.
>
> Ms. Chaitman: Can you tell me where else it would have been?
>
> Mr. Sylvester: I'm not saying where it was taken from, I'm not here.
>
>     . . . .
>
> Ms. Chaitman: Let me say this. When the documents were produced to us, there was no Mortgage and Note Modification Agreement produced with any signatures on it other than Jennifer's and ... I'm wondering if it came out of some file other than produced to us. . . .
>
> Mr. Sylvester: Okay. I'll take your request under advisement. Let's proceed.

At this point, if not before, defendants certainly should have disclosed that the modification agreement on which the bank moved for summary judgment was a copy of the agreement in the bank's files, having been placed there by the defendants after they discovered it among Grove's papers. This disclosure was not made.

On December 7, 1991, after the Witherspoon deposition, Grove's attorney wrote to defendants "to repeat the requests ... that you produce all originals of the mortgage and note modification agreement ... and all faxed copies in the Bank's files, within the next five days." In subsequent letters to defendant Sylvester dated

December 11 and 17, 1991, Grove's attorney again complained that Sylvester had not responded to her prior requests. It was only at the continuation of Calenda's deposition, on December 27, 1991, that Liloia finally stated that the signed copy of the agreement had come from the Grove files.

The inference that may be drawn from this pattern of behavior is that defendants were stonewalling and that they intended to conceal from Grove's attorney the source of the signed copy of the agreement even after repeated clear requests for that information. That defendants placed the copy of the signed agreement in the bank's files prior to producing them for inspection as the bank's "original" files is particularly disturbing and suggests purposeful misrepresentation. Such conduct appears on its face to violate the New Jersey Rules Governing Civil Practice and the Rules of Professional Conduct.

## B

Although a motion seeking, among other things, an award of attorney's fees against Summit was filed in the foreclosure litigation, the motion is not in the record provided to us. We do know that in early January 1992, after the above-described events took place, Grove sought sanctions against Summit based in large part on the conduct of the bank's attorneys and seeking various forms of relief including reimbursement for counsel fees.[6] The trial court consolidated the present lawsuit with the foreclosure litigation for discovery purposes only and, on December 18, 1992, issued certain rulings from the bench. The Summit case thereafter settled. It does not appear that Grove's sanctions motion was decided before the Summit litigation settled, or that the Baxts' right to seek sanctions against Liloia and Sylvester was specifically preserved.

---

[6] This information can be found in an affidavit submitted by Grove's attorney in support of the cross-motion and provided in plaintiffs' appendix.

We observe that *Rule* 4:23–3 provides for reasonable expenses where the opposing party "fails to admit . . . the truth of any matter as requested under *R.* 4:22," should the party requesting the admission thereafter prove the truth of the matter, and that *Rule* 4:23–4 provides for costs where a party "fails to comply with a demand for a copy of a document made pursuant to *R.* 4:18–2." The relief sought here—attorney's fees and costs—would have been available under those rules.[7] Plaintiffs made repeated requests concerning the origin of the signed modification agreement. Those requests were ignored or answered in a deceptive manner by Summit's attorneys. By placing the signed agreement in Summit's files and by misleading plaintiffs as to its source, defendants violated the mandate of our Court Rules that fair dealing with opposing parties is an absolute requirement even in an adversary system such as ours. Justice Pollock's concurrence in *Kernan v. One Washington Park Urban Renewal Assocs.*, 154 *N.J.* 437, 467, 713 A.2d 411 (1998), is equally applicable here:

> More egregious examples of discovery abuse may exist. The nondisclosure in this case, however, suffices to make the point. Shenanigans have no place in a law suit. Modern litigation is too time consuming and expensive for courts to tolerate discovery abuses. For over fifty years, courts have endeavored to transform civil litigation from a battle royal to a search for truth.

That the Baxts' attorney was able to discover the provenance of the signed modification agreement does not justify misuse of the discovery process. But for the settlement of the foreclosure litigation, plaintiffs could have sought attorney's fees based on defendants' conduct in that lawsuit. Instead, the Baxts reserved the right to seek attorney's fees against defendants in this action. Because the dismissal of this action leaves plaintiffs without a remedy for defendants' discovery violations, and because the settlement agreement put defendants on notice that the issue of attorney's fees remained to be litigated, in the unique circumstances of this case we will permit plaintiffs to go forward with their reserved right to seek counsel fees by way of a motion

---

[7] Had the conduct at issue in this case occurred subsequent to the adoption of *Rule* 1:4–8 in 1996, sanctions under that rule would also have been available.

pursuant to *Rule* 4:50–1(f) ("On motion, with briefs, and upon such terms as are just, the court may relieve a party ... from a final judgment or order for ... (f) any other reason justifying relief from the operation of the judgment or order."). They may within 30 days seek to reopen the order of dismissal in *Summit Trust Company v. Grove Mercantile Center* for the limited purpose of seeking recovery of reasonable expenses from Gerald Liloia and Anthony Sylvester for violations of the discovery rules. *See R.* 4:23–3, –4. If plaintiffs pursue their case in that forum, the trial court should determine the scope of defendants' misconduct and the appropriate amount of attorney's fees and costs to be assessed against them.[8]

## C

*RPC* 8.3(a) requires that "[a] lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority." Grove's attorney should have reported the violations alleged herein to the Office of Attorney Ethics ("OAE") or the local District Ethics Committee at the time they occurred. She did not.

Defendants' conduct requires that we refer this matter to the OAE for its review and consideration. Plaintiffs should inform the OAE whether they intend to pursue sanctions against defendants for discovery violations in order that the OAE may stay its review until the civil action is completed.[9]

As modified, the judgment of the Appellate Division is affirmed.

---

[8] Defendants, citing *Hawkins v. Harris*, 141 *N.J.* 207, 214–17, 661 *A.2d* 284 (1995), contend that their conduct is subject to the privilege of communications in judicial proceedings. We need not in this case reach the question of the extent of the privilege in New Jersey. Suffice it to say, defendants cannot raise the privilege as a defense in a discovery sanctions proceeding.

[9] Our decision is based on the record before us on motion for summary judgment below. The trial court, if plaintiffs seek sanctions for discovery rule

*For modification and affirmance*—Chief Justice PORITZ, and Justices HANDLER, O'HERN, STEIN, COLEMAN and PRESSLER—6.

*Opposed*—None.

---

violations, and the OAE shall make their determinations *de novo* on the record as appropriately supplemented pursuant to this decision.