783 A.2d 756 (2001)
345 N.J. Super. 119
Denise GILLES, Plaintiff-Appellant,
v.
WILEY, MALEHORN & SIROTA, Arthur L. Raynes, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 2001.
Decided November 14, 2001.
*757 Evan L. Goldman, Metuchen, argued the cause for appellant (Frizell Goldman Jaffe & Samuels, attorneys; Mr. Goldman, of counsel and on the brief).
Meredith Kaplan Stoma, Livingston, argued the cause for respondents (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Ms. Stoma, of counsel; Elise Dinolfo, on the brief).
Before Judges PRESSLER, WEFING and LESEMANN.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Plaintiff Denise Gilles appeals from a summary judgment dismissing her legal malpractice complaint against defendants, the law firm of Wiley, Malehorn & Sirota, and its partner, Arthur L. Raynes, who had represented her. The gravamen of her complaint is that Raynes, voluntarily and without good cause attributable to her, terminated the representation without adequately protecting her against the running of the statute of limitations, thus causing her to lose her medical malpractice cause of action. We are satisfied that plaintiff made a sufficient showing of a prima facie case in resisting the motion to compel its denial.
Much of the critical factual background is not in dispute. Plaintiff's asserted medical malpractice cause had its genesis in a colonoscopy she underwent on February 26, 1996, to determine the cause of occult bleeding. Several polyps were found and removed and she was discharged the same day. She continued, however, to have bleeding, and a second colonoscopy was performed on February 28, 1996, which disclosed an ulcerated area as the source of the bleeding and which was treated. The gravamen of the asserted medical malpractice was that the physician who performed the second colonoscopy perforated her colon, requiring her to undergo an emergency surgical repair that day. During her week-long hospital stay following the surgery, she developed a right hydropneumothorax that retarded her recovery. She apparently did, however, fully recover.
Persuaded by advice she had received from a physician family member that the perforation resulting in the emergency surgery was caused by malpractice, she consulted Raynes in early April 1996. While the record does not indicate whether a retainer agreement was entered into at that time, Raynes candidly conceded at his deposition that a representation had been entered into and that he was her lawyer. Plaintiff, as she made clear in her deposition, certainly understood that he was representing her and was relying on him to take whatever steps were necessary to protect and advance her interests.
The record does not indicate exactly how much communication plaintiff and Raynes had with each other in the ensuing months. This much at least is clear. At Raynes's instruction, plaintiff obtained and delivered to him the relevant medical records. *758 Raynes explained to her that before suit could be commenced, he would need a report from a medical expert opining that she had been the victim of malpractice. Accordingly, he sought an opinion from a forensic gastroenterologist, Dr. Andrew Lo of Beth Israel Medical Center in New York, who reported to him that he believed there had not been malpractice. By letter dated March 24, 1997, Raynes advised plaintiff of Dr. Lo's opinion but added that:
Let me make clear that the above opinions on your care are those of Dr. Lo, and not of this office. We are willing to pursue your case further. However, in order to make this case viable, we will need to find an expert witness who can testify authoritatively that the care you received did not meet acceptable medical standards. If we do proceed with your case, we will need to lay out additional monies to potential witnesses in order to find one who agrees that you have received substandard treatment. This means that you will incur several hundred more dollars of expenses.
The letter concluded with Raynes's request that plaintiff telephone him to "discuss this further and decide whether you want us to continue to search for an independent expert." Plaintiff communicated her desire to proceed and agreed to pay the expenses involved.
A little over three months later, Raynes received a report dated July 3, 1997, from Dr. Lawrence B. Stein, a board-certified gastroenterologist, who opined that the second colonoscopy had been incorrectly performed in that a hot biopsy forceps had been used, that instrument having the highest risk of the complication of perforation and not recommended by the medical literature to control bleeding. He referred to other available instruments, including a heater probe and bicap electrode, concluding that use of the hot biopsy forceps "greatly increased the likelihood of creating a colonic perforation and is a deviation from acceptable medical practice." Raynes mailed a copy of Dr. Stein's report to plaintiff on July 18, 1997, under cover of letter simply referring to it and making no further comment thereon.
On October 20, 1997, Raynes wrote to plaintiff again complaining that she had not yet paid the $1,204 she had been billed to cover expenses. The letter noted that the last payment he had received from her was the previous May. He then went on to say that:
I understand that you want us to continue representing you in this matter; if that has changed, please advise us accordingly. In any event, you must reimburse us for the monies we have disbursed in working on your case thus far, as well as any expenses which may result from future work on your case. We cannot continue as your attorneys unless you fulfill that responsibility.
I would ask that you pay us in full by no later than October 31, 1997. If we do not receive payment from you by that time, we may reconsider our representation of you in this matter.
If you have any questions about our bill, please promptly contact our administrator, Ms. Deirdre Petersen.
Although there was some dispute as to when that $1,204 was paid and as to just what the installment arrangements, if any, had been, Raynes agreed in his deposition testimony that by the beginning of January 1998 the balance due had been reduced to something just under $125.
Despite the favorable report from Dr. Stein, Raynes did not file a medical malpractice complaint. Some six months had gone by after his receipt of that report, when, on January 6, 1998, Raynes wrote the following letter to plaintiff:

*759 This is to advise that our firm has taken a new direction, away from most plaintiffs' malpractice cases. I therefore need to tell you that we will not be in a position to file suit on your behalf.
The work that we have done for you, in obtaining a report from a reputable expert, Dr. Stein, will be useful to you with your next attorney. I enclose a copy of that report for you. Your next attorney will know to obtain the required affidavit from Dr. Stein.
You have two years from the incident of malpractice to file suit. This should afford you sufficient time to obtain another attorney. Failure to file suit within the two year period will likely result in your losing your right to sue. I suggest that you contact another attorney immediately to protect your rights.
There are numerous attorneys who handle medical malpractice cases. I recommend Tom Chesson of Porzio, Bromberg and Newman, whose telephone number is (973) 538-4006, or Adrian Karp, whose telephone number is (973) 267-7787.
We have not charged you at all for our legal time. We have only charged you for reimbursement to us of our expenses.
Best of luck to you.
Several comments must be made about that letter. First, at his deposition, Raynes explained that the firm had had some financially negative experience with contingent fee cases and while some were retained and some new ones being undertaken, they were not regarded as a desirable type of business. He then went on to explain that plaintiff's case was not as goodpresumably in terms of damages-as he had originally thought and that Dr. Stein's report was not as strong as he had hoped for. He also suggested that plaintiff's failure to make prompt payment of the bill for expenses played a part in his decision to terminate the representation, although this had not been expressed to her and although her balance at the time of the termination was relatively insignificant.
In any event, the letter, which referred to the two-year statute of limitations but did not expressly state the date on which it would expire, came as a complete surprise to plaintiff, who, as she testified, was away on a trip when it was sent and did not believe that she actually received it until the end of January 1998. She did not, upon its receipt, immediately attempt to communicate with another lawyer, either one of the lawyers mentioned by Raynes or anyone else. As she testified on her deposition, she thought that if Raynes were sending her to another lawyer, then he should have made the referral himself and that in any event, she was so upset when she did receive his letter that she was unable to mobilize herself to take further steps although she did see another lawyer after the statute ran, some three or four weeks later.
There is nothing in the record suggesting any reason for Raynes not having taken any action with respect to plaintiff's case during the six-month period between his receipt of Dr. Stein's favorable report and his letter of withdrawal to plaintiff. Dr. Stein had agreed to provide an affidavit of merit in compliance with N.J.S.A. 2A:53A-26 to -29, and presumably a suit could have been started. Nor is there any explanation for Raynes having waited six months to withdraw.
We consider the applicable legal principles in the light of the foregoing facts. To begin with, the requisite elements of a cause of action for legal malpractice are the existence of an attorney client relationship creating a duty of care *760 upon the attorney, the breach of that duty, and proximate causation. Conklin v. Hannoch Weisman, 145 N.J. 395, 416, 678 A.2d 1060 (1996). In general terms, the attorney's duty to the client is to pursue the client's interests diligently and with the highest degree of fidelity and good faith. See, e.g., Matter of Yetman, 113 N.J. 556, 562, 552 A.2d 121 (1989); Matter of Stein, 97 N.J. 550, 563, 483 A.2d 109 (1984). The attorney must do so by exercising "that degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise." St. Pius X House of Retreats v. Camden Dioc., 88 N.J. 571, 588, 443 A.2d 1052 (1982). Plaintiff asserts that Raynes breached his duty to her by unreasonably terminating the attorney-client relationship so soon before the running of the statute of limitations and without adequately protecting her interests in preserving her cause of action.
The Rules of Professional Conduct (R.P.C.s) speak to termination of the representation. And while we recognize that a cause of action for malpractice cannot be based exclusively on the asserted breach of an R.P.C., nevertheless it is clear that the R.P.C.s may be relied on as prescribing the requisite standard of care and the scope of the attorney's duty to the client. Baxt v. Liloia, 155 N.J. 190, 201, 714 A.2d 271 (1998); Davin, L.L.C. v. Daham, 329 N.J.Super. 54, 74 n. 3, 746 A.2d 1034 (App.Div.2000). Thus violation of an R.P.C. has essentially the same status and function in a malpractice action as a statute that prescribes a standard of conduct has in a negligence action. Its breach is evidential of defendant's failure to comply with the required standard of care. See, e.g., J.S. v. R.T.H., 155 N.J. 330, 348, 714 A.2d 924 (1998).
We turn then to R.P.C. 1.16, captioned "Declining or Terminating Representation." To the extent here relevant, that rule provides that where the conduct of the client does not justify the attorney's withdrawal, the attorney "may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client...." R.P.C. 1:16(b). Paragraph (d) of the rule further requires that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests...." The issue then, as we view it, is whether in the totality of the circumstances, Raynes's withdrawal, considering both the manner in which it was done and its timing, was accomplished without "material adverse effect" on plaintiff's interests in that it was attended by those steps "reasonably practicable" to protect her interests.
The trial judge concluded that Raynes had, beyond any question of material fact, acted reasonably. The sole basis of that conclusion was our decision in Fraser v. Bovino, 317 N.J.Super. 23, 35, 721 A.2d 20 (App.Div.1998), in which we held that in the circumstances there an attorney's termination of the attorney-client relationship "several weeks" before the statute of limitations had run was reasonable in that it afforded plaintiff adequate time to obtain another lawyer. We did not, however, in Fraser establish a bright-line rule that a withdrawal several weeks before the running of the statute of limitations is reasonable as a matter of law. We reached that conclusion there based on the operative facts in that case including the plaintiff's sophistication as a business man having regular dealings with lawyers, including such dealings with respect to the basic transactions in controversy; his having failed to raise the issue of possible litigation with defendant attorney until five years and nine months of the six-year statute of limitations had elapsed; and the *761 brief period, some three months, during which the defendant-lawyer reviewed and studied the file. We note further that the defendant-lawyer there had denied that he had ever undertaken the representation.
Clearly the determination of reasonableness is ordinarily circumstantially dependent, and we are satisfied that a finder of fact would be justified in finding from the circumstances here that the timing and method of withdrawal were not reasonable. The facts here are very different from those in Fraser. Here, unlike Fraser, there was never a disavowal during a twenty-one month period of representation that Raynes represented plaintiff. As he said in his deposition, "I was her lawyer." For a six-month period he had all the information he needed not only to commence an action but also to have reached the conclusion that he eventually did reach respecting the probable unprofitability of the representation, a conclusion that evidently was the primary reason for the withdrawal. Plaintiff, on the other hand, was an unsophisticated lay person unaccustomed to legal dealings. The letter of termination, moreover, while it referred to the two-year statute of limitations and "suggest[ed]" plaintiff contact another lawyer immediately, did not specify the critical date. Finally, a fact-finder could also conclude that the period of time left to plaintiff before the statute of limitations had run was unreasonably short, particularly in view of the preceding six-month period following Raynes's receipt of Dr. Stein's favorable report. In this regard, we note that medical malpractice cases are ordinarily difficult representations and are not lightly or casually undertaken by serious and responsible lawyers. It is by no means clear that plaintiff could have obtained a new lawyer who, in three weeks, would have been able to review her file, make the necessary evaluations, and agree to file a complaint, particularly after knowing that her previous lawyer, who had represented her for twenty-one months, had suddenly declined to continue. After all, it apparently took Raynes six months after having reviewed the medical records and experts' reports to decide that he was no longer interested. Finally, and most significantly, a finder of fact could have found that Raynes failed to take those steps "reasonably practicable" to protect her interests, a matter we address hereafter.
Plaintiff supported her resistance to the summary judgment motion by submission of a report from an expert, a member of the bar of this State. The report opined that defendant, after his almost two years of representation, should not have terminated the relationship by a letter sent by ordinary mail but rather should have explained the situation and its imperatives to the client or, at the least, sent her his withdrawal by certified mail both to assure its timely receipt and to impress upon her the urgency of the situation. He also opined that considering the late withdrawal, reasonable steps to protect her interests would have required him to prepare for her a pro se complaint which she could have filed to avoid the danger of the statute running. The report did not expressly opine that, in view of all the circumstances, the withdrawal was adverse to plaintiff's interests because the remaining time was too short to enable her to obtain the services of another lawyer, but we regard it as implicitly so concluding in its reference to the pro se complaint. That is obviously a recourse of last resort, as it were, to avoid the looming limitations problem.
The point, of course, is that plaintiff perceived herself as having been abandoned by defendant too late in the day to enable her to protect herself, and we do not regard that perception as prima facie unreasonable. We addressed the issue of *762 abandonment in Kriegsman v. Kriegsman, 150 N.J.Super. 474, 479, 375 A.2d 1253 (App.Div.1977). Although we were there dealing with an attorney's motion for leave to withdraw from a matter already in litigation, what we said there is equally apt to an attorney's pre-litigation obligations. Thus, in affirming the denial of that motion, we started from the premise that "[w]hen a firm accepts a retainer to conduct a legal proceeding, it impliedly agrees to prosecute the matter to a conclusion. The firm is not at liberty to abandon the case without justifiable or reasonable cause, or the consent of its client." We appreciate that Kriegsman was decided before the adoption of the current R.P.C.'s and the express authorization of R.P.C. 1:16, permitting an attorney to terminate the representation if he can do so without material adverse effect on the client's right and with reasonable steps to protect the client's interest. But our rationale in Kriegsman remains as relevant today as it was then in defining the attorney's duty. As we explained:
We are not unmindful of the fact that the Rose firm has performed substantial legal services for plaintiff and clearly is entitled to reasonable compensation therefor. Nevertheless, an attorney has certain obligations and duties to a client once representation is undertaken. These obligations do not evaporate because the case becomes more complicated or the work more arduous or the retainer not as profitable as first contemplated or imagined. Cf. Suffolk Roadways, Inc. v. Minuse, 56 Misc.2d 6, 287 N.Y.S.2d 965, 969-970 (Sup.Ct.1968). Attorneys must never lose sight of the fact that "the profession is a branch of the administration of justice and not a mere money-getting trade." Canons of Professional Ethics, No. 12. As Canon 44 of the Canons of Professional Ethics so appropriately states: "The lawyer should not throw up the unfinished task to the detriment of his client except for reasons of honor or self-respect."

[Id. at 480, 375 A.2d 1253.]
See also Haines v. Liggett Group, Inc., 814 F.Supp. 414, 422-424 (D.N.J.1993) (referring to the current R.P.C.s and relying on the Kriegsman rationale).
Whether Raynes's withdrawal afforded plaintiff a reasonable opportunity in the circumstances to protect her cause of action was, in our view, at least a question of fact precluding summary judgment dismissing the complaint.
The summary judgment appealed from is reversed and we remand for further proceedings.