**John MRUZ, Vasilike D. Nika, and Jane Johnson, Plaintiffs,**

*v.*

**CARING, INC., et al., Defendants.**

**Civil No. 97–1468(SMO).**

United States District Court,
D. New Jersey,
Camden Vicinage.

Aug. 4, 2000.

Susan B. Pliner, Gary Green, Robert A. Davitch, Scott A. George, Sidkoff Pincus & Green, P.C., Merchantville, NJ, for Plaintiffs.

Paul A. Rowe, Alan S. Naar, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP, Woodbridge, NJ, for Defendants Fox, Rothschild, O'Brien & Frankel, LLP, and Ian Meklinsky.

## OPINION

KUGLER, United States Magistrate Judge.

This court is, regrettably, once again faced with an allegation of attorney misconduct and a motion to revoke *pro hac vice* admission. As is becoming clear to attorneys who practice in this District, this court is growing increasingly distressed by the deteriorating level of civility and decorum that has long been the hallmark of this estimable profession. It is the obligation of this court to protect and nurture the vestiges of professional legal conduct so that the practice of law is once again not only socially and commercially valuable, but also enjoyable and worthy of esteem. This court takes this obligation seriously, and conduct before the court that violates the principles of courtesy and professionalism embodied in the Rules of Professional Conduct will not be tolerated.

Defendants Fox, Rothschild, O'Brien & Frankel, LLP, and Ian Meklinsky, Esquire, have moved before this court for an Order revoking the *pro hac vice* admission of plaintiffs' counsel, Gary Green, Esquire, for his misconduct during several depositions. Defendants also have moved for certain other sanctions, including a protective order precluding Mr. Green from any further participation in this case as an attorney, either directly or indirectly, and an order awarding defendants attorneys' fees and costs associated with the filing and resolution of this motion.

As discussed below, this court finds that Mr. Green's misconduct violated fundamental precepts of professional civility and, accordingly, revokes his *pro hac vice* admission. The court denies that portion of defendants' motion that seeks certain other relief.

## I. INTRODUCTION

Plaintiffs filed this action on March 21, 1997, against their former employer and associated entities and individuals, referred to here as the Caring defendants.[1] The extensive factual background of this case is set forth in detail in two prior Opinions by the Honorable Stephen M. Orlofsky, published at 991 F.Supp. 701 (D.N.J.1998) ("*Mruz I*"), and 39 F.Supp.2d 495 (D.N.J.1999) ("*Mruz II*"). Also named as defendants were Fox, Roths-

---

1. The Caring defendants include: CARING, Inc., CARING Residential Services, Inc., CARINGHouse Projects, Inc., CARING Medical Day Services, Inc., CARING Fellowship Centers, Inc., CARING International, Inc., Comprehensive ElderCARING, Inc., Coastal Support Services, Inc., Ann J. Underland, Carlisle W. Underland, Garfield L. Greene, Lewis W. Field, and Mary E. Haynie.

child, O'Brien & Frankel, the law firm that the Caring defendants hired to represent it in connection with the plaintiffs' allegations of Medicaid and tax fraud, and Ian Meklinsky, Esquire, an attorney associated with the Fox, Rothschild firm (hereinafter collectively referred to as "the Fox defendants").[2]

Susan B. Pliner, Esquire, of Sidkoff, Pincus & Green, P.C., a licensed New Jersey attorney, entered her appearance as counsel of record for the plaintiffs.[3] On July 7, 1997, the court granted the unopposed motion of Gary Green, Esquire, of Sidkoff, Pincus & Green, P.C., to be admitted *pro hac vice* as counsel for plaintiffs. Mr. Green is not licensed in New Jersey, but he certified that he was a member in good standing of the bar of Pennsylvania, and that he was familiar with, and agreed to comply with, the Local Rules for the District of New Jersey, including all disciplinary rules. The Order granting Mr. Green's *pro hac vice* status stated that Mr. Green shall be bound by the Local Civil Rules, including the provisions regarding disciplinary rules. The Order specifically referred Mr. Green to Local Civil Rule 103.1 (then Rule 6), and Local Civil Rule 104.1 (then Rule 7).

Rule 103.1 provides that the Rules of Professional Conduct of the American Bar Association, as revised by the New Jersey Supreme Court, shall govern the conduct of attorneys admitted to practice in this court. This Rule also incorporated the *Guidelines for Litigation Conduct*, which were adopted by the American Bar Association's Section of Litigation, August, 1998,

to "encourage civility, courtesy and professionalism among the bench and the bar," which Mr. Green acknowledged that he had read.[4] (Tr. 129:17 to 21). Rule 104.1 provides for discipline for attorney misconduct.

## II. BACKGROUND

### A. Previous Warnings

From the beginning, both plaintiffs' counsel and defense counsel have made this case exceedingly contentious, so much so that they have been previously reprimanded by Judge Orlofsky for their unprofessional and *ad hominem* attacks in their briefs submitted to the court and for their abuse of the litigation process.

In *Mruz I,* the court characterized plaintiffs' briefs as containing "enough blunderbuss and invective so as to border on the uncivil."[5] 991 F.Supp. at 711. The court concluded with:

> Plaintiffs' brief contains several *ad hominem* attacks on Defendants which I decline to repeat here [some of which were listed at n. 14]. While I recognize and indeed, encourage the professional duty of counsel to represent their clients with zeal and vigor, I take this opportunity to remind counsel of their obligations under Rule 11 of the Federal Rules of Civil Procedure, and of their duties to this Court.

991 F.Supp. at 721.

In *Mruz II,* the court repeated the warnings, this time specifically with reference to a brief filed by defense counsel:

> used in that brief: "Well, Your Honor, to the extent that I participated in writing that brief, I understood that [Judge Orlofsky] was—I understood from his ruling there and all of his rulings that he was making *ad hominem* attacks as something that all counsel, defendant's counsel, Mr. Rowe, me, Mr. Davitch, Mr. Naar and all the lawyers in the case. But I wasn't the sole author of that brief." (Tr. 114–5 to 11.) This court notes, however, that Mr. Green signed that brief. *See* Fed.R.Civ.P. 11(b)(1).

---

**2.** The Fox defendants are the only defendants remaining in the case.

**3.** Ms. Pliner was subsequently replaced as local counsel by Steven H. Griffiths, Esquire, and Mr. Griffiths was replaced by Scott A. George, Esquire, all of Sidkoff, Pincus & Green, P.C.

**4.** *See* discussion of these Guidelines at n. 14, *infra.*

**5.** When this was brought up to Mr. Green at the oral argument on this motion, he attempted to avoid personal blame for the language

"Attorneys who reflexively react to 'litigation abuse' by engaging in similar conduct disserve their clients and burden the dockets of busy courts. For the second time in this case, I admonish counsel that such conduct is unprofessional, unwarranted and unseemly. It will not be tolerated in the future." 39 F.Supp.2d at 507.

Mr. Green acknowledged that while primarily directed at defense counsel, the warning applied to his conduct as well. (Tr. 118–8 to 119–8). He also understood that a violation of these explicit commands or the Rules of Professional Conduct would lead to sanctions. (Tr. 118–4 to 7).

### B. The Depositions

This is a deposition-intensive case, with many of the depositions spanning several days over many months. At the time this motion was filed, twenty-nine days of depositions had been conducted, and several more depositions remained to be taken. Most of the depositions have been conducted by Alan S. Naar, Esq., one of the attorneys for the Fox defendants, and Robert B. Davitch, Esq., one of the plaintiffs' attorneys from Sidkoff, Pincus & Green, P.C., who also has been admitted *pro hac vice* in this case. There have been no allegations of misconduct between Messrs. Naar and Davitch, or among any other lawyers participating in the depositions in this case, other than Mr. Green.

Mr. Green conducted or participated in the following depositions: (1) one day of the deposition of Caring board member, Sister Grace Nolan; (2) one day of the deposition of Caring board member, Rev. Garfield Greene; and (3) four days of the deposition of Defendant Ian Meklinsky.[6] It was after the fourth day of Mr. Meklinsky's deposition on May 10, 2000, that defense counsel suspended the remainder of the deposition and sought leave from the court to file this motion, which was granted.[7]

Defense counsel claim that at all of the depositions in which Mr. Green participated, he engaged in highly uncivil and abusive behavior clearly designed to intimidate witnesses and counsel and to obstruct the discovery process. Mr. Green, on the other hand, strenuously denies that he did anything wrong. He is both apologetic for what he terms "isolated instances" of a lack of restraint and ardently defensive of his overall conduct, characterizing his efforts as zealous advocacy on behalf of his clients. Counsels' arguments are addressed more fully below.

In connection with this motion, the parties submitted extensive briefs, exhibits, certifications, and supplemental certifications. Oral argument was held on this motion on July 7, 2000. This court has carefully reviewed the portions of the deposition transcripts that were supplied with the moving papers, and listened to the audio tapes of Mr. Meklinsky's deposi-

6. Mr. Meklinsky's deposition took place on November 29 and 30, 1999, December 1, 1999, and May 10, 2000.

7. Plaintiffs' counsel argue that defense counsel have waived their right to seek revocation because they never raised the issue of Mr. Green's conduct to Mr. Green, Mr. Green's partners, or the court before abruptly filing this motion in the middle of a deposition, even though some of Mr. Green's conduct about which they are complaining dates back six months or more.

The court finds that defense counsel did not waive their right to seek revocation. The fact that they did not seek the court's help after Mr. Green's first outburst, or his second or

third, does not prevent them from seeking relief from the court when the cumulative effect of Mr. Green's conduct tips the scale into sanctionable territory. *See Comuso v. National Railroad Passenger Corp.*, 2000 WL 502707, *2 n. 2, Civ. No. 97–7891 (E.D.Pa. Apr. 26, 2000) ("[T]he Court is unaware of any authority that requires a motion for sanctions to be filed in a specific time period . . .").

Moreover, the court finds that defense counsel were not required to seek a protective order under Fed.R.Civ.P. 26(c) before seeking the sanction of revocation. A protective order directing counsel to conform his behavior to the rules of professional conduct would be of little use.

tion that were made by the court stenographer.[8] Specific sections of the deposition transcripts that bear upon this motion are set forth below.

## III. DISCUSSION

### A. Court's Inherent Power to Discipline Attorneys

Defense counsel asks the court to exercise its inherent power to revoke the *pro hac vice* admission of Mr. Green. The scope of a court's inherent power to sanction attorney conduct was explored in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The *Chambers* Court recognized that "[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." 501 U.S. at 43, 111 S.Ct. 2123 (quoting *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821)). These powers are " 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " *Id.* (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962)).

■ Courts are vested with great discretion in imposing sanctions under their inherent powers, limited by the principles that inherent powers must be exercised with "restraint and discretion," and that the particular sanction must be tailored to address the harm identified. *Id.* at 44–45, 111 S.Ct. 2123. *See Republic of Philippines v. Westinghouse Electric Corp.*, 43 F.3d 65, 74 (3d Cir.1994); *Martin v. Brown*, 63 F.3d 1252, 1264–65 (3d Cir. 1995).

■ The Third Circuit has cautioned courts to make specific factual findings before imposing sanctions under their inherent powers. *Republic of Philippines*, 43 F.3d at 74–75. A court must evaluate the conduct at issue and explain why it warrants a sanction, giving weight to such things as whether it was a pattern of misconduct or an isolated incident, whether it was a grave wrongdoing or a minor infraction, whether it actually prejudiced the wrongdoer's opponent or hindered the administration of justice, and whether mitigating factors exist. *Id.* at 74. A court also "must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate." *Id.* A court need not make a specific finding of bad faith in order to impose sanctions under its inherent power.[9]

8. The audiotapes of Mr. Meklinsky's deposition were provided to the court, at its request, by defense counsel Mr. Naar. The court reporters retained by Mr. Green for the deposition of Ian Meklinsky recorded portions of the depositions on audiotape as a back-up for preparing transcripts. The audiotapes are not official recordings of the depositions and do not cover every word that was said at the depositions. Several portions of the first day's recording are missing due to a malfunction in the recording equipment. Other portions of the depositions are missing because the court reporter may not have immediately changed tapes when one side of a tape was full. The court kept these limitations in mind when reviewing the tapes and always cross-checked them with the deposition transcripts. The purpose for listening to the audiotapes was to determine the tone and manner of some of counsels' statements.

9. Plaintiffs' counsel argues that under *Chambers*, this court is required to make a finding that Mr. Green acted in bad faith before it can invoke its inherent powers. *Chambers* did not hold that a court must make a finding of bad faith in order to exercise its inherent power to discipline an attorney. Rather, in discussing under what circumstances a court may use its inherent power to shift attorney's fees *against a party* as a sanction, the Court recognized that the longstanding "American Rule" against fee shifting had three common law exceptions, one of which was when a party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " 501 U.S. at 45–46, 111 S.Ct. 2123 (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). Thus, *for matters involving attorney fee shifting,* a court's inherent power is limited to those circumstances where a party has acted in bad faith. This discussion in *Chambers*

The scope of a court's inherent power is very broad, and it includes the authority to control admission to its bar and to discipline attorneys who appear before it, including those admitted *pro hac vice. Chambers*, 501 U.S. at 43, 111 S.Ct. 2123; *In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 383 (3d Cir.1997) (explaining that federal courts have many disciplinary sanctions available, including the power to control admission to its bar, discipline attorneys, and disqualify counsel); *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir.1984) ("One of the inherent powers of any federal court is the admission and discipline of attorneys practicing before it."); *Cannon v. Cherry Hill Toyota*, 190 F.R.D. 147, 161 (D.N.J.1999) (court's inherent power "may be invoked to regulate the conduct of lawyers appearing before it and, when necessary, may be invoked to impose sanctions on those lawyers who violate the Rules of Professional Responsibility, the Federal Rules of Civil Procedure, the Local Rules or the general obligations of attorneys practicing in the federal courts to work towards a just, speedy and efficient resolution of claims").

This District has expressly endorsed our courts' authority to discipline attorneys practicing here, whether they are licensed in New Jersey or admitted *pro hac vice. See* Local Civil Rule 104.1 (*Discipline of Attorneys*) ("The Court, in furtherance of its inherent power and responsibility to supervise the conduct of attorneys who are admitted to practice before it or admitted for the purpose of a particular proceeding (*pro hac vice*), promulgates the following Rules of Disciplinary Enforcement ..."); Local Civil Rule 103.1 (*Judicial Ethics and Professional Responsibility*), com-

ment 2 ("[T]he District of New Jersey follows the Rules of Professional Conduct promulgated by the New Jersey Supreme Court," and "both local counsel and counsel appearing *pro hac vice* are subject to the Court's disciplinary powers."); Local Civil Rule 101.1(c)(4) (*Admission of Attorneys*) ("A lawyer admitted *pro hac vice* is within the disciplinary jurisdiction of this Court.").[10]

### B. *Pro Hac Vice Revocation as a Disciplinary Sanction*

As a general rule, an attorney licensed and in good standing in one state will be permitted to make an appearance in a federal court sitting in another state as a matter of comity. *See* L. Civ. R. 101.1(c) (*Appearance Pro Hac Vice; Local Counsel*) ("Any member in good standing of the bar of any court of the United States or of the highest court of any state, who is not under suspension or disbarment by any court and is ineligible for admission to the bar of this Court under L. Civ. R. 101.1(b), may in the discretion of the Court, on motion, be permitted to appear and participate in a particular case.")

Admission *pro hac vice* is a privilege, not a right, and the decision to admit out-of-state counsel for a particular case is in the sound discretion of the court. *See Leis v. Flynt*, 439 U.S. 438, 442, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (admission *pro hac vice* "is not a right granted either by statute or the Constitution"); *Cooper v. Hutchinson*, 184 F.2d 119, 122 (3d Cir. 1950) ("It has always been thought that the license to practice law is limited, except as a matter of grace, to persons who had fulfilled the local requirements for practice."); *Thoma v. A.H. Robins Co.*, 100 F.R.D. 344, 348 (D.N.J.1983). It may be

---

was rooted in the strict limitations of the American Rule, and it did not purport to impose a bad-faith requirement upon anything other than attorney fee shifting. *See also Republic of Philippines*, 43 F.3d at 74 n. 11 (acknowledging Justice Scalia's dissent in *Chambers* that "the fact that fee-shifting as a sanction requires a finding of bad faith 'in no way means that all sanctions imposed under

the courts' inherent authority require a finding of bad faith.'" (citation omitted)).

10. *See Thoma v. A.H. Robins Co.*, 100 F.R.D. 344 (D.N.J.1983) (noting that the United States Supreme Court has held that valid local rules have the force of law) (citing *Weil v. Neary*, 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243 (1929)).

revoked for improper or unethical conduct. *See, e.g., Johnson v. Trueblood,* 629 F.2d 302, 304 (3d Cir.1980); *Data Systems Analysts, Inc. v. Netplex Group,* 187 F.R.D. 181 (D.N.J.1999); *Eagan v. Jackson,* 855 F.Supp. 765 (E.D.Pa.1994).

Plaintiffs' counsel argues that revocation of *pro hac vice* admission is the functional equivalent of disbarment and can only be imposed for serious ethical violations that would justify disbarment of a New Jersey licensed attorney. They argue that *pro hac vice* admission has never before been revoked for misconduct which is merely discourteous or uncivil and that, therefore, Mr. Green could not have been on notice that his deposition conduct could lead to his removal from the case. Revocation under these circumstances, they argue, would violate fundamental principles of due process.

Contrary to plaintiffs' counsel's contention, the Third Circuit has not treated

revocation of *pro hac vice* admission as the functional equivalent of disbarment. Plaintiffs' counsel cite a number of cases from other jurisdictions for their proposition. The standards for *pro hac vice* admission and revocation, however, vary widely among jurisdictions. Not only do the cited cases from other jurisdictions have very little precedential value to this court, but most of them do not set out the standard as clearly as plaintiffs' counsel claim they do.[11]

An examination of Third Circuit law and the Local Rules of this District indicates that in this court, *pro hac vice* admission may be revoked for misconduct that falls short of that which would warrant disbarment. For example, Local Civil Rule 101.1(d) provides that *pro hac vice* admission may be revoked merely for an attorney's failure to abide by scheduled court dates.[12] In *Johnson v. Trueblood,*

**11.** For example, in *Schlumberger Technologies, Inc. v. Wiley,* 113 F.3d 1553 (11th Cir. 1997), the Eleventh Circuit examined the standards for *admission* of an attorney *pro hac vice,* holding that a court must admit an attorney absent a showing of unethical conduct rising to a level that would justify disbarment. The court further held, however, that "[t]he standards governing disqualification of an attorney already admitted to appear before the district court differ, depending on the circumstances. If the conduct at issue threatens disruption of the court proceedings ... or is a deliberate challenge to the authority of the district court ... we give great deference to a trial court's decision to disqualify the responsible attorney." 113 F.3d at 1561. This holding, which is not inconsistent with the standards the court applies here, is far different than that which plaintiffs' counsel cite it for in their brief.

In *Kirkland v. National Mortgage Network, Inc.,* 884 F.2d 1367 (11th Cir.1989), the Eleventh Circuit reversed the district court's decision revoking an attorney's *pro hac vice* admission because it failed to give him notice and a hearing. The court's focus was on the procedural requirements for revocation, and its observation that revocation of *pro hac vice* carried the "brand of disbarment" was dicta.

Several of the other cases cited by plaintiffs' counsel are criminal cases which implicate constitutional concerns under the Sixth

Amendment that are not present in a civil case. *Cf. Leis v. Flynt,* 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (holding that an attorney does not have a property interest under the Fourteenth Amendment in appearing *pro hac vice* in another state, but not addressing the criminal defendants' constitutional rights in having counsel of their choice represent them).

The one Third Circuit case cited for this proposition by plaintiffs' counsel, *Cooper v. Hutchinson,* 184 F.2d 119 (3d Cir.1950), also involved a criminal defendant's right to counsel of his choice. The Third Circuit noted that the narrow question before the court was "the extent to which an accused person's choice of counsel is a constitutional right" and held that counsel admitted *pro hac vice* "in a capital case cannot be arbitrarily and capriciously removed without depriving their clients of rights conferred by the [C]onstitution." 184 F.2d at 123. *Cooper* does not purport to set forth a standard for revocation of *pro hac vice* in civil cases under the circumstances presenting themselves here.

**12.** (d) *Adherence to Schedules: Sanctions*
All members of the bar of this Court and those specially permitted to participate in a particular action shall strictly observe the dates fixed for scheduling conferences, motions, pretrial conferences, trials or any oth-

the Third Circuit's most comprehensive discussion of *pro hac vice* revocation, nowhere does the court hold that *pro hac vice* may only be revoked for ethical misconduct that would justify disbarment. In fact, the court found that "[a]t a minimum, a violation of any disciplinary standard applicable to members of the bar of this court would justify revocation of *pro hac vice* status." 629 F.2d at 304. The court left "open the question whether different cases require different standards." *Id. See also Data Systems Analysts, Inc. v. Netplex Group, Inc.*, 187 F.R.D. at 183 ("Revocation of *pro hac vice* admission is a recognized sanction for violation of court orders or disciplinary rules.").

While attorneys admitted *pro hac vice* are subject to the same rights, duties and standards as are members of the bar, the sanctions for attorney misconduct need not be, and are not, identical for both *pro hac vice* attorneys and members of the bar. There are significant considerations attending the nature of *pro hac vice* practice that bear upon a court's choice of sanction. The disciplinary actions that this court can take against an errant New Jersey attorney may have a significant effect upon the attorney's license to practice law, including suspension, disqualification, or disbarment. This court has no such authority over an out-of-state attorney's license, its only options in that regard being a referral to the disciplinary board of the state in which that attorney practices and/or the revocation of the attorney's *pro hac vice* admission. In addition, the same incentives may not exist for New Jersey bar members and out-of-state attorneys to maintain a consistent level of respect and decorum out of concern for their reputation in this jurisdiction. *See Johnson v. Trueblood*, 629 F.2d at 304. These differences in the nature of practice indicate that *pro hac vice*

revocation is but one of the disciplinary sanctions available to a court, even if the same misconduct would not result in the disbarment of a New Jersey attorney.

### C. *Pro Hac Vice Revocation: Due Process*

■ Procedurally, a court considering revocation of an attorney's *pro hac vice* admission must give the attorney "a meaningful opportunity to respond to identified charges." *Johnson v. Trueblood*, 629 F.2d at 304. Notice should consist of two things: "the conduct of the attorney that is the subject of the inquiry, and the specific reason this conduct may justify revocation." *Id.* A court must also give written reasons for any revocation. *Id.*

It is true that *Johnson v. Trueblood* did not go so far as to set forth an encompassing standard that governs the revocation of *pro hac vice* admission in all civil cases. However, the guidance that it did provide is sufficient to enable this court to conclude, as it does, that Mr. Green's misconduct during the depositions in this case violated the established standards of civility and professionalism embodied in Rule 3.2 of the Rules of Professional Conduct and calls for the revocation of his *pro hac vice* admission. The court also finds, as discussed below, that Mr. Green was sufficiently put on notice of the conduct that is the basis of this motion and the standards by which his conduct is judged.

### 1. Rule of Professional Conduct 3.2: *Courtesy and Consideration*

■ Rule 3.2 provides: "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client and shall treat with courtesy and consideration all persons involved in the legal process." Plaintiffs' counsel argues that RPC 3.2 is merely aspirational, citing

---

er proceedings. Failure of counsel for any party, or of a party appearing *pro se*, to comply with this Rule may result in the imposition of sanctions, including the withdrawal of the permission granted under L.Civ.R. 101.1(c) [*pro hac vice*] to partici-

pate in the particular action. All applications for adjournment shall be made promptly and directed to the Judge or Magistrate Judge to whom the matter is assigned.

L. Civ. R. 101.1(d).

*Baxt v. Liloia,* 155 N.J. 190, 714 A.2d 271 (1998), and has never been used as a basis for the sanction of revocation.

The New Jersey Supreme Court in *Baxt v. Liloia,* 155 N.J. 190, 714 A.2d 271 (1998), explained that the Rules of Professional Conduct, including RPC 3.2, are not "merely aspirational," but are established canons setting forth the minimum level of competency which must be displayed by all attorneys and which serve as the standard by which lawyers may be disciplined. 155 N.J. at 197–204, 714 A.2d 271.[13] Indeed, the court specifically remarked that "[t]he concept of professionalism embodied in RPC 3.2 lies at the core of what it means to be a good lawyer." 155 N.J. at 203, 714 A.2d 271. The court emphasized that New Jersey's disciplinary system was "one of the most demanding disciplinary systems in the nation," noting that:

> Chief Justice Wilentz wrote, almost twenty years ago, "that the principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general." *In re Wilson,* 81 N.J. 451, 456, 409 A.2d 1153 (1979). He believed that "public confidence in this Court and in the bar as a whole requires the strictest discipline." *Id.* at 461, 409 A.2d 1153. His message remains powerful today.

155 N.J. at 203–04, 714 A.2d 271.

In *In re Lester T. Vincenti,* 114 N.J. 275, 554 A.2d 470 (1989), in sanctioning an attorney for violations of RPC 3.2 and 8.4(d) (declaring it unprofessional for a lawyer to "engage in conduct that is prejudicial to the administration of justice"), for, *inter alia,* using loud, abrasive, and profane language against his adversary and an opposing witness, the Court explained the import of the requirement of professionalism and courtesy:

This conduct violates RPC 3.2 and 8.4(d). Respondent's conduct is intolerable because it has an effect that tends to undermine the proper administration of justice. Conduct calculated to intimidate and distract those who, though in an adversarial position, have independent responsibilities and important roles in the effective administration of justice cannot be countenanced.... There cannot be genuine respect of the adversary system without respect for the adversary, and disrespect for the adversary system bespeaks disrespect for the court and the proper administration of justice.

These considerations have importuned us to stress repeatedly that *attorneys are required to act with common courtesy and civility at all times in their dealings with those concerned with the legal process. Should an attorney fail to abide by these requirements, discipline should be imposed.*

114 N.J. at 281–82, 554 A.2d 470 (emphasis added).

It is evident that New Jersey courts treat their disciplinary rule RPC 3.2 and the civility and professionalism of lawyers which it addresses as more than just aspirational. Sanctions based upon violations of RPC 3.2 are certainly not unprecedented. *See, e.g., In re Lester T. Vincenti, supra* (suspending attorney for three months); *In re Joseph F. Flayer,* 154 N.J. 2, 710 A.2d 1008 (1998) (suspending attorney for six months for misconduct violating various RPCs, including RPC 3.2); *In re UDIT Steven Sharma,* 150 N.J. 205, 696 A.2d 12 (1997) (suspending attorney for one year for, *inter alia,* violation of RPC 3.2); *In re Edward J. Gaffney,* 138 N.J. 85, 648 A.2d 723 (1994) (suspension for two and one-half years for same); *Kramer v. Tribe,* 156 F.R.D. 96 (D.N.J.1994) (dismiss-

---

**13.** The phrase in *Baxt v. Liloia* that plaintiffs' counsel seems to be relying on is an incomplete quotation of the court's discussion. The court's complete statement is: "Many of the disciplinary rules are aspirational in nature and, therefore, particularly unsuitable for use

*outside of the disciplinary system.*" 155 N.J. at 203, 714 A.2d 271 (emphasis added). *Baxt v. Liloia* ultimately held that parties may not state a cause of action on the basis of a violation of the Rules of Professional Conduct.

ing complaint based on misconduct of attorney, including violation of RPC 3.2); *Cannon v. Cherry Hill Toyota,* 190 F.R.D. 147 (D.N.J.1999) (explaining that sanctions may be imposed for conduct that violates, *inter alia,* RPC 3.2).

To say that Mr. Green was unaware that a violation of RPC 3.2 could lead to the imposition of sanctions is unsupportable. His conduct during the depositions, as laid out below, decidedly crosses over the line from zealous advocacy to abusive, boorish, and disrespectful behavior that obstructs the administration of justice and disserves his profession and the interests of his clients. This court does not accept Mr. Green's assertion that he had no reason to know that his behavior was unacceptable. His performance offends common principles of decency and courtesy. As a practicing lawyer for almost thirty years, Mr. Green must have knowledge of the basic practices of legal and professional decorum. In *Hall v. Clifton,* 150 F.R.D. 525 (E.D.Pa.1993), the court explained why it was so important for lawyers to conduct themselves professionally during depositions:

> [D]epositions are to be limited to what they were and are intended to be: question-and-answer sessions between a lawyer and a witness aimed at uncovering the facts in a lawsuit. When a deposition becomes something other than that

because of the strategic interruptions, suggestions, statements, and arguments of counsel, it not only becomes unnecessarily long, but it ceases to serve the purpose of the Federal Rules of Civil Procedure: to find and fix the truth.

Depositions are the factual battleground where the vast majority of litigation actually takes place.... The pretrial tail now wags the trial dog. Thus, it is particularly important that this discovery device not be abused. Counsel should never forget that even though the deposition may be taking place far from a real courtroom, with no black-robed overseer peering down upon them, as long as the deposition is conducted under the caption of this court and proceeding under the authority of the rules of this court, counsel are operating as officers of this court. They should comport themselves accordingly ...

150 F.R.D. at 531 (citations omitted). This court finds it hard to believe that Mr. Green would be unaware of this well-publicized opinion issued by the late Judge Gawthrop in the Eastern District of Pennsylvania, the jurisdiction in which Mr. Green primarily practices.

Moreover, Mr. Green admitted that he was familiar with the *Guidelines for Litigation Conduct* adopted by this court, which his conduct clearly violated.[14] Al-

---

**14.** These Guidelines, which are set forth in Appendix R of the Local Civil Rules, provide in pertinent part:

> A lawyer's conduct should be characterized at all times by personal courtesy and professional integrity in the fullest sense of those terms. In fulfilling our duty to represent a client vigorously as lawyers, we will be mindful of our obligations to the administration of justice, which is a truth-seeking process designed to resolve human and societal problems in a rational, peaceful, and efficient manner.
> * * *
> Conduct that may be characterized as uncivil, abrasive, abusive, hostile, or obstructive impedes the fundamental goal of resolving disputes rationally, peacefully, and efficiently. Such conduct tends to delay and often to deny justice.

> * * *
> 1. We will practice our profession with a continuing awareness that our role is to zealously advance the legitimate interests of our clients. In our dealings with others we will not reflect the ill feelings of our clients. We will treat all other counsel, parties, and witnesses in a civil and courteous manner, not only in court, but also in all other written and oral communications ...
> 2. We will not, even when called upon by a client to do so, abuse or indulge in offensive conduct directed to other counsel, parties, or witnesses. We will abstain from disparaging personal remarks or acrimony toward other counsel, parties, or witnesses. We will treat adverse witnesses and parties with fair consideration.
> * * *

though these Guidelines are aspirational and may not be the basis for sanctions, they put a lawyer on notice of what kinds of behavior may otherwise violate the Rules of Professional Conduct and other disciplinary rules. *See* L. Civ. R. 103.1, comment 4 ("[C]onduct that violates the Guidelines will also often violate a standard of conduct sanctionable under . . . the disciplinary rules."). Most importantly, Mr. Green was put on notice by Judge Orlofsky's opinions in *Mruz I* and *Mruz II* of exactly the kind of unprofessional and *ad hominem* comments and outbursts that would not be tolerated in this case.

No proper findings could be made without setting forth in detail the portions of the deposition transcripts in which Mr. Green's conduct crosses the line. Consequently, the court finds it necessary to quote verbatim from the deposition transcripts as follows, noting with discouragement that there were many more examples that could have been listed.

### D. *Offensive Conduct*

During the deposition of Rev. Garfield Greene, the parties telephoned the court pursuant to Local Civil Rule 37.1(a)(1) to resolve a dispute. The colloquy during and following this conference gives context to the outcome of this motion. Mr. Green had been objecting to Mr. Naar's questions. This court overruled the objections and instructed Mr. Green as follows:

> 4. We will not, absent good cause, attribute bad motives or improper conduct to other counsel.
> * * *
> 20. We will not engage in any conduct during a deposition that would not be appropriate in the presence of a judge.
> 21. We will not obstruct questioning during a deposition or object to deposition questions unless permitted under applicable law.
> 22. During depositions we will ask only those questions we reasonably believe are necessary, and appropriate, for the prosecution or defense of an action.

Mr. Green, if you feel the question is leading, state your objection, the deposition will continue . . .

(Garfield Greene Dep. 41–15 to 17).

Mr. Green, I think Mr. Naar understands the risk he runs with the questions he asks. But he's correct, the rule says note your objection and continue with the deposition.

(*Id.* at 43–13 to 16).

A few minutes later, however, when counsel resumed the deposition outside the presence of the Court, the transcript reveals the following:

> MR. NAAR: . . . as the Judge said you make your objection.
> MR. GREEN: Judge didn't tell me anything. Didn't tell me what to say in an objection . . .

(*Id.* at 51–24 to 52–2).

> MR. NAAR: And the Judge has ruled—
> MR. GREEN: The Judge didn't rule.[15]

(*Id.* at 77–21 to 22).

Thereafter, Mr. Green continued to argue and at one point accused Mr. Naar of "polluting the whole process," (*id.* at 77–18),[16] and "witness manipulation," (*id.* at 86–1).

Even before filing this suit, Mr. Green's behavior was unprofessional.[17] On October 4, 1996, Ian Meklinsky (now a defendant) attempted to interview Jane Johnson (now a plaintiff) about the allegations she made in a letter to members of the Caring Board. Mr. Meklinsky was acting as what he termed "special counsel" for the Board,

App. R., Local Civil Rules of the United States District Court for the District of New Jersey.

**15.** Mr. Green conceded at oral argument that the court ruled on his objections. (Tr. 141–24 to 142–1).

**16.** He now excuses that accusation as mere "shop talk." (Tr. 146–14).

**17.** Mr. Green implied he should not be held accountable for actions occurring before he filed suit. (Tr. 128–14). The court disagrees.

investigating the matter on behalf of the Board. Mr. Green represented Ms. Johnson at that interview and his vicious attacks on Mr. Meklinsky speak for themselves:

> Let's end this. I think this is the biggest crock of crap that I've ever seen, and I think you are involved with the coverup of Ann Underland and shouldn't be trusted.

(Johnson Interview Tr., 196–10 to 15).

> Let's terminate this now and we'll let the chips fall where they are. You ought to be ashamed of yourself.

(*Id.* at 196–16 to 19).

> I think that—that if you are not going to state on the record—If you're not man enough to state what your recommendation is up until now, then you can't be trusted.

(*Id.* at 197–3 to 8).

> Let's stop it now. You can go out in the hallway and continue this. I don't want to look at you now. This is despicable. I don't believe you did this …

(*Id.* at 210–8 to 12).

> I'm telling you to get the hell out of here, because you're no damn good. You're a disgrace to the profession. Now get out.

(*Id.* at 210–19 to 23).

His only justification for these outrageous outbursts are that Meklinsky "tricked" him. (Tr. 129–14).

Problems continued at every deposition Mr. Green participated in, though not until the Meklinsky deposition would there be the same level of intensity. The short transcript excerpts provided to this court reveal that Mr. Green interrupted at least a half dozen times the answers Sister Grace Nolan attempted to give at her deposition on December 3, 1998. And at one point, Mr. Green remarked to defense

counsel: "Thank you very much, Justice Brande[i]s …" (Nolan Dep. 60–20 to 21).

At his own deposition on December 16, 1999,[18] Mr. Green refused to comment on testimony given by another witness:

> If you'd like to make an appointment with my receptionist if you have a question that you would like answered and a legal opinion I'm sure that we can accommodate you, but I think under the rules I'm here to give factual information. Although, as I said, we could use the business. I'm spending a lot of time in this room here making nothing, I sort of need the income. I invite you to come and make an appointment.
>
> Q. I'll tell you that—
>
> A. Please ask me questions. I don't want to waste time. I'm really not interested in what's on your mind. I want to answer questions.
>
> Q. Reverend Cobb has testified—
>
> A. Is this a question?
>
> Q. Yes. I can start off the question—
>
> A. I don't think it's proper to ask me a question about somebody else's testimony when I wasn't there. You have to ask me what I know. I'm not going to be challenged by someone else's testimony. It's whatever he said, he said and it's in the record. I don't have to take your word for what he said and I don't care what he said. I know what I know.

(Gary Green Dep. 98–1 to 23).

Yet, Mr. Green did not hesitate to employ the same practice that he had condemned in his own deposition, when confronting Mr. Meklinsky with the testimony of Carl Underland, despite defense counsel's objections.[19] On May 10, 2000, he read an incomplete portion of Mr. Underland's testimony to Mr. Meklinsky and asked, "Is that the way you remember the discussion?" (Meklinsky Dep. 685–11 to

---

18. Defense counsel have indicated that Mr. Green may be a witness in this litigation, although they have not moved to disqualify him pursuant to RPC 3.7.

19. The court is not suggesting that it is always improper to ask deponents about other witnesses' testimony.

12). After reading another incomplete passage, he asked Mr. Meklinsky, "Did you say what Carl Underland testified you said in P. 202?" (Meklinsky Dep. 701–19 to 20).

The court understands that Defendant Meklinsky is the primary target of the remaining claims and that his credibility (or lack thereof) will have an enormous impact on the jury. Consequently, the court would not expect that Mr. Green treat him with kid gloves. Nevertheless, that does not excuse the degree of Mr. Green's hostility and unprofessionalism. It is clear that Mr. Green's proclivity to constantly interrupt Mr. Meklinsky's answers,[20] together with defense counsel's objections thereto, led to constant and useless bickering and set the tone for Mr. Green's personal attacks upon Mr. Meklinsky and defense counsel. The Court will simply relate some of it as it appears in the transcript, in chronological order:[21]

Q. And I am asking—that is a very good invasive [evasive] answer. Now try and answer the question I asked . . .
* * *

Q. . . . By the way, according to your bio you were some sort of bright star accounting student before you became a lawyer, weren't you?

(Meklinsky Dep. 205–12 to 15).

A. I know what it says, Mr. Green.

Q. You obviously don't. Your answer was either intentionally misleading, eva-

**20.** It is difficult even with the assistance of the audio tapes kept by the stenographer to accurately count the number of such interruptions. This court's best estimate is sixty-six.

**21.** Only included are the most glaring examples of misconduct. Excluded are the constant sarcastic statements.

**22.** For unexplained reasons, Mr. Green refuses to concede he called Mr. Meklinsky a "liar" at this deposition. "As for the issue of calling Mr. Meklinsky a liar, the passages quoted by Mr. Rowe do not support the spin he put on them." (Corrected Certif. of Gary Green, Esq., ¶ E3(b), at 29). During oral argument on this motion, the following discussions occurred:

sive or you didn't read the whole sentence . . .

(*Id.* at 259–13 to 18).

MR. GREEN: He didn't answer it. The question I am giving him another chance to answer because he beat around the bush. He evaded. I am entitled to get a better answer.

(*Id.* at 264–11 to 16).

Q. That doesn't answer my question. It's an evasion.

(*Id.* at 280–18 to 19).

Q. . . . Now we have to sit here while this lawyer/ witness/ defendant gives gratuitous answers that are just waiting [wasting] time.

(*Id.* at 312–16 to 18).

Q. That's another gratuitous answer to a question I didn't ask . . .

(*Id.* at 336–23 to 24).

Mr. GREEN: Could you please read back my question. It's another gratuitous piece of whatever it is that has nothing to do with my question.

(*Id.* at 370–14 to 17).

MR. GREEN: I just have two more questions in this area, assuming I get responsive answers and not gratuitous remarks.

(*Id.* at 372–6 to 9).

MR. GREEN: . . . I want to show on the record and for later use at trial that this lawyer/witness is a liar[22] and an

MR. GREEN: In a deposition, I did not say to the witness that I could recall, you are a liar.
THE COURT: You never called a witness a liar?
MR. GREEN: I talked to—
THE COURT: That's what you're telling me now?
MR. GREEN: I don't recall, I said.
THE COURT: You're telling me—
MR. GREEN: I don't know.
THE COURT: Now wait a minute.
MR. GREEN: I can't—
THE COURT: Wait a minute.
MR. GREEN: I could tell you I don't recall.
THE COURT: Now, wait a minute, Mr. Green.
MR. GREEN: Yes.

evader. So therefore I'm asking him questions that will show to anyone who hears what his answers are what is obvious to anyone who knows what the truth is.

(*Id.* at 420–21 to 23).

MR. GREEN: Fine. I'm entitled to make the record. Let somebody else believe whether any of his answers have the semblance of truth.

(*Id.* at 422–18 to 21).

Q. ... Or you have your own lawyer. He can ask you all the questions you want him to ask you. I'm asking you questions that I think will get to the truth.

(*Id.* at 589–9 to 12).

Q. So, therefore, since you probably think you've just answered my questions truthfully, we know that you didn't pay attention or even try....

(*Id.* at 601–14 to 16).

MR. GREEN: You know what, it's so good to have this on the record I can't refrain myself. I apologize for saying "good." I'm counting money in my head—I'm sorry.

(*Id.* at 625–8 to 12).

MR. GREEN: Oh, come on. You don't have to sit through the same bullshit. I'm asking him a direct question. I want his answer.

MR. NAAR: You're interrupting him—

MR. GREEN: All right. You're just dragging this out.

(*Id.* at 629–22 to 630–4).

MR. GREEN: It is a waste, Alan, for a lawyer to be testifying—

MR. NAAR: That's his testimony and you have interrupted him.

MR. GREEN: That's not responsive. I move to strike a nonresponsive answer. I asked him what he disagreed with on

THE COURT: Your adversaries make a big point in their briefs of you using the word liar to describe the conduct of a witness. Now, are you telling me that you did or did not use the word liar?

the account of what took place at this meeting. And we have three volumes of evasion just like that.

(*Id.* at 690–12 to 22).

MR. GREEN: They are your objections and his evasions. If you would object where you properly should and he would answer the question without trying to hide from the truth, you wouldn't have three volumes, you would have one.

(*Id.* at 807–9 to 15).

MR. GREEN: When I am paying for the deposition and he's intentionally not answering the question like in that last time and you condone it, I have no choice but to interrupt or I'll be here all day as he puts BS on the record to hide from the truth. The guy's going down and he doesn't want to face it.

(*Id.* at 808–20 to 809–4).

MR. GREEN: I don't think it is the answer to the question. I think it's just another proof of his evasion.

(*Id.* at 812–2 to 5).

MR. GREEN: I am thrilled with the answer. I just want to dig it in so the judge can see who he is considering when he makes a referral ...

(*Id.* at 812–10 to 13).

Q. The question is, what were you trying to evade when you....

(*Id.* at 820–4 to 5).

Mr. Green did not limit his comments to the witness Meklinsky. Unfortunately, he directed some of the more pointed statements towards his adversary, Alan Naar, Esq., and others. Again, the transcripts speak for themselves.

MR. GREEN: ... You were asserting a work product when you weren't the attorney. It's not your privilege to assert.

MR. GREEN: I may have used the word liar, ...

(Tr. 115–18 to 116–11).

The whole thing is bogus and will be exposed.

(Meklinsky Dep. 288–8 to 11).

MR. GREEN: Fine. The record says what it says. There's a lot of things that you purport to the court that turn out to be false. Now we have proof of it.

(*Id.* at 288–22 to 289–1).

MR. GREEN: We'll see. You'll be lucky if you're allowed to practice in Camden after this is over.

(*Id.* at 289–21 to 23).

MR. GREEN: You've made representations to the court that have been false since the beginning of this case and now we have proof of it.

(*Id.* at 290–1 to 4).

MR. GREEN: Well, you know what I think about what you say. You're not under oath.

MR. NAAR: Okay. I would think that between counsel on something that is not really a major issue that we could at least have a basic understanding between counsel. Apparently, my—

MR. GREEN: It's a major issue because you elected not to put dates on the signatures, even though you were required to do it.

MR. NAAR: There was no election of dates. If you had a problem at the time, you should have told me.

MR. GREEN: To tell you the truth I usually trust lawyers. I've learned since.

MR. NAAR: Well, I have no problem with your partner.

MR. GREEN: Well, he may have a problem with you.

MR. NAAR: Okay.

MR. GREEN: I know you have no reason to have a problem with my partner. It doesn't mean he doesn't have a problem with you—

(*Id.* at 299–5 to 300–6).

MR. GREEN: Let me just say for the record, the day that you limit my questions will be the day you're wearing a black robe.

(*Id.* at 373–24 to 374–2).

MR. GREEN: I did not ask that question about a labor issue before. And you're making an erroneous statement that's interfering with the flow of the examination.

(*Id.* at 683–16 to 20).

MR. GREEN: Listen, I can't wait for you to do that because it just piles on with all the other stuff that you have done to try and protect this guy.

(*Id.* at 713–13 to 17).

MR. GREEN: When you say something that's dishonest or not true, I will interrupt you.

MR. NAAR: You have repeatedly interrupted him in the middle of answers because you don't like the beginning of his answer. It is clear to me.

MR. GREEN: The truth of the matter is when it is not responsive.

MR. NAAR: Wait, stop yelling at me.[23]

MR. GREEN: Alan, when you wear a robe, you can tell me what to do.

(*Id.* at 807–19 to 808–8).

MR. GREEN: I want to make a record so the judge can see because when I file a motion for sanctions[24], I want the

---

**23.** The audio tapes make it clear that Mr. Green has a habit of yelling. The court notes that during its interactions with Mr. Green at conferences and oral argument he tends to raise his voice to very high levels.

**24.** He made no such motion. Nor did Mr. Green ever contact the court for assistance during this deposition. He clearly knew from this court's instructions that the option of calling the court from the deposition was available.

judge to see how many times I asked the same simple question and you and he conspired to frustrate my ability to have an examination.

(*Id.* at 815–2 to 8).

And Mr. Green had some accusations in the guise of questions about Jonathan D. Weiner, Esq., Mr. Meklinsky's law partner who also had done legal work for the Caring Boards:

Q. But Mr. Weiner blatantly attempted to lie and mislead to create a false impression that when my clients authored an allegation—strike that—authored P.1 that there was no support for their allegations; isn't that what happened?

(Meklinsky Dep. 432–9 to 13).

Q. Well, that's not really accurate either, is it, Mr. Meklinsky? Read your first sentence. Read Mr. Weiner's first sentence. You may feel that way, but he knew what he was doing when he wrote this false statement.

(*Id.* at 433–5 to 9).

Q. Well, tell me before you get to that third paragraph, in Weiner's lying letter here . . .

(*Id.* at 434–13 to 14).

The attacks continued with the submission of papers regarding cross-motions to compel discovery and this motion to revoke. In plaintiffs' Opposition to Defendants' Cross–Motion to Compel Discovery and for Certain Other Relief, dated July 5, 2000,[25] the following passages appear:

. . . Defendants manufacture out of whole cloth a scheme . . .

(Pl. Br. Opp. to Defs. Cross–Motion to Compel Discovery, at 1).

While a compelling story, it is the stuff of beach reading and not a meritorious argument.

(*Id.*).

At least Mr. Naar was honest about one thing . . .

(*Id.* at 25).

Defendants offer in a convoluted footnote in their brief an odd series of thoughts.

(*Id.*).

Defendants' obvious bad faith aside . . .

(*Id.*).

In addition, Plaintiffs' Opposition to Defendants' Motion for an Order Revoking the Pro Hac Vice Admission of Plaintiffs' Counsel, dated June 12, 2000,[26] contains the following:

. . . such serious gaps in the factual setting Defendants describe that this version of the events is too unbelievable to be of any use.

(Pl. Br. Opp. Defs. Mot. for Revocation, at 1).

---

**25.** Mr. Green's name appears, with others, on the cover page and the signature page.

**26.** At oral argument, Mr. Green attempted to blame his associate, Mr. George, for this brief: "... when you asked him to justify the extraordinary relief, he cited the brief here. Well, quite frankly, Your Honor, the brief that was filed in this case was not signed by me. And the sections he made reference to were not sections that I wrote. They're not my statements. He's asking in a sense, to disqualify Mr. Scott George now because he cited his part of the brief and Mr. George signed it." (Tr. 114–13 to 19). Mr. Green did admit he read the brief before it was filed, (Tr. 114–21), and his name appears both on the cover page and the signature page. He is responsible for its contents.

Clearly, Defendants embraced the idea of this Motion out of despair over what Mr. Meklinsky said in his testimony.

(*Id.* at 4).

Indeed Mr. Rowe probably thought he had the liberty to fictionalize with adjectives bordering on the hysterical.

(*Id.* at 7).

But what Mr. Rowe lacks in first hand knowledge of the deposition he makes up for in fiction writing.

(*Id.* at 8).

... Mr. Rowe uses all types of trickery ...

(*Id.*).

Defendants took the law into their own hands.

(*Id.*).

... Mr. Rowe's work of fiction.

(*Id.* at 12).

In the sworn Corrected Certification [27] of Gary Green, Esq., appear the following:

But at this point, I note only that the fact that Mr. Rowe includes something that happened in October of 1996, says much about the lack of merit and sincerity of his motion, which in turn may explain also his almost hysterical tone and word choice.

(Corrected Certif. Gary Green, at 10).

Moreover, Mr. Naar was signaling that Mr. Meklinsky should go back to one of his vague, evasive answers ... [28]

(*Id.* at 36).

In response to Mr. Naar's coaching testimony in front of Mr. Meklinsky ...

(*Id.*).

I will endeavor to respond to the hyped allegations and character maligning ex-cesses written by Paul A. Rowe, Esq., the lawyer for Defendants.

(*Id.* at 4).

### E. *Findings*

The above recitations are incomplete, but serve to illustrate the point: Mr. Green was venomous, abusive, outrageous and personal. He used sarcasm to such a degree as to render the fact-finding process of a deposition virtually meaningless and his legal briefs incredible. His unprofessional conduct not only added hours to the deposition, but caused the parties and the court to spend significant time and resources addressing this motion. All this superfluous attorney time in a case that potentially involves fee shifting does great harm to the litigants. Mr. Green is no more serving the interests of his clients with this deposition behavior than he is with the hours and expense spent responding to this motion. Nor is he creating a usable record.

Courteous, professional, respectful behavior—a standard of conduct that is attendant to a license to practice law—would have alleviated this burden and expense and allowed this case to move efficiently to a resolution on the merits. Mr. Green, who is obviously endowed with sharp cross-examination skills, should have saved his performance for trial. But as so many lawyers seem to have forgotten, zealous advocacy within the courtroom, and within the bounds of the federal rules of procedure and evidence, should not be inconsistent with respect and courtesy towards an adversary.

The court acknowledges that Mr. Green made attempts to apologize for, excuse or explain his actions. He admits his comments were "far from dainty," "biting or

---

**27.** This so-called Certification was improperly filed. The court will overlook the requirement that such documents be either affidavit or unsworn declarations (28 U.S.C. § 1746). However, the document is mostly legal argument and commentary in violation of L. Civ. R. 7.2(a) and contains matters not of Mr. Green's personal knowledge.

**28.** Having carefully reviewed the transcripts, this court cannot conclude there is any evidence of coaching the witness. *See* Fed. R.Civ.P. 30(d)(1).

sarcastic," and "sporadic lapses in the high standards of professionalism I set for myself." He claims to be sorry for some of the language he used. (Tr. 151–6 or 7). But he continues to believe these were mere "mistakes," because of "circumstances" and that he was provoked by opposing counsel and the witness. (Tr. 130–8 to 9). And, he claims that "[s]ometimes when you're trying to juggle a lot of things in the heat of what is going on, mistakes are made." (Tr. 130–20 to 22). Clearly, Mr. Green considers his behavior regrettable, but necessitated by the circumstances and the instigations of defendants and defense counsel. In a word, he is unrepentant.

The court has meticulously reviewed all the transcripts, audio tapes and papers submitted. It condemns Mr. Green's behavior, and rejects any suggestion that different, less stringent sanctions should apply in the spirit of zealous advocacy. There is a clear pattern of misconduct here, not just an isolated incident or two. The assaults on counsel and witnesses were relentless. Every deposition in which Mr. Green participated was fraught with problems. Each brief submitted to this court was laden with personal attacks.[29] Mr. Green purposefully disregarded the admonitions and warnings of Judge Orlofsky, thereby violating an Order of this court.

Mr. Green's conduct clearly resulted in prejudice to defendants and to the administration of justice. As noted above, it caused significant delays and distractions in a case that has already been pending in this court over three years and caused the parties and the court to unnecessarily expend valuable time and resources. To be sure, defense counsel were not always paragons of professionalism themselves. They too had been admonished by Judge Orlofsky for their overly contentious acts, and Mr. Naar was guilty of one or two inflammatory outbursts himself at the Meklinsky deposition.[30] While the court recognizes that in such heated circumstances, a certain level of provocation and reaction is to be expected, Mr. Green clearly overreacted to what this court finds to be minimal provocation on the part of defense counsel. The answers and objections of Messrs. Naar and Meklinsky did not justify the degree of abuse dispatched by Mr. Green. The fact that Mr. Green may be unhappy with a deponent's answers is not a license to badger and harass the witness and his attorney. Mr. Green must take the answers that are given, and leave the interpretation of the answers to the fact-finder. The conduct of Meklinsky and Naar do not mitigate the extent of Mr. Green's misconduct.

Other, lesser sanctions were carefully considered. These would include prohibiting Mr. Green from attending the remainder of Mr. Meklinsky's deposition (or any other depositions), Fed.R.Civ.P. 26(e)(5), monetary penalties for the time and expense wasted by the incessant (and useless) bickering, a period of "probation" for Green where any further misconduct would automatically result in revocation, and setting time limits on further depositions, F.R.Civ.P. 30(d)(2). However, none would rectify the grievous harm caused by Green's actions.

By its very nature, the discipline of an attorney must be a pliable mechanism, in order for the penalty to be shaped to fit the circumstances. In the exercise of its inherent powers to discipline attorneys, the court must evaluate the type and degree of an attorney's misconduct, and the type of sanction, if any, that would best

---

**29.** The similarities to those passages cited by Judge Orlofsky in *Mruz I* are striking.

**30.** An example is the following exchange:

Mr. Green: Fine. The record says what it says. There's a lot of things that you pur-

port to the court that turn out to be false. Now we have proof of it.

Mr. Naar: Okay. But I'm going to respond to that. That's a crock of crap and you know it.

(Meklinsky Dep., at 288–22 to 289–4).

remedy the damage done to the particular litigation and to the judicial process as a whole. The court must keep in mind that the primary objective of any sanction is to preserve the integrity of the process, rather than to punish the offender. This court believes that revocation is the most effective way to serve the goals of restoring this particular case to its track toward a just resolution and maintaining respect for the court system.

Mr. Green's behavior is so wanting, so far beyond the pale of the conduct expected of attorneys practicing in this court, that the court must conclude he has forfeited any right to practice here in this case. The court takes no pleasure in this outcome. It is indeed a sad day for all of us in the justice system when such extraordinary relief is sought and ordered.

The single most often expressed complaint that this court hears from long-standing members of the New Jersey bar is about the uncivil behavior of lawyers towards others. This Opinion and Order will not solve these problems of deteriorating professionalism, but perhaps it will give some comfort to those concerned about the future of this wonderful profession. The court must attempt to ensure that litigation is not practiced as if it were nuclear war.

For all of these reasons, the court will grant defense counsel's motion to revoke the *pro hac vice* admission of Gary Green, Esquire.